The Honorable _____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | |
|---|---|
| JESSICA BRUNELLE, an individual; and JONATHAN ADELSTEIN, an individual, <br><br> Plaintiffs, <br><br> v. <br><br> PEACEHEALTH, a Washington nonprofit corporation; and ROBERT AXELROD, an individual, <br><br> Defendants. | Case No. 3:22-cv-5499 <br><br> COMPLAINT <br><br> 1. False Claims Act Retaliation, 31 U.S.C. § 3730(h) <br> 2. Whistleblower Retaliation, R.C.W. § 49.60.210 <br> 3. Aiding Unfair Practices, R.C.W. § 49.60.220 <br> 4. Breach of Contract <br> 5. Wrongful Discharge <br><br> JURY TRIAL DEMANDED |

## I.    NATURE OF THE ACTION

1.    Plaintiffs Jessica Brunelle and Jonathan Adelstein discovered that a PeaceHealth staff psychiatrist was engaging in a pattern of conduct that violated not only PeaceHealth's professed values and ethical obligations, but also state and federal law. Having faith in the organization's integrity, jointly and separately they blew the whistle to multiple individuals within PeaceHealth. Over the course of nearly a year, they were subject to a coordinated effort at first to silence, then to discredit, their complaints. Ultimately Plaintiffs were forced out of the organization.

## II.    JURISDICTION

2.    This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

3.     The court has supplemental jurisdiction over Plaintiffs' state law claims set forth herein pursuant to 28 U.S.C. § 1367(a). Both the federal and state law claims alleged herein arise out of a common nucleus of operative facts.

4.     Venue is proper within the Western District of Washington at Tacoma pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this judicial district and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

### III.     PARTIES

5.     Plaintiff Ms. Brunelle is an individual citizen of Washington. For nearly all of her professional life, she served PeaceHealth as a dedicated employee. At the time of her constructive discharge in April 2022, she had worked more than twenty-four years for the organization. During the relevant period, Ms. Brunelle was a manager in the Behavioral Health unit at PeaceHealth St. John Medical Center ("SJMC"). Ms. Brunelle's work for PeaceHealth was in a non-ministerial, secular capacity. Under Washington law, during the relevant period, she was an employee of each Defendant. At relevant times, Ms. Brunelle openly identified herself to Defendants as a whistleblower as that term is defined under Washington law.

6.     Plaintiff Dr. Adelstein is a citizen of Illinois, and a double board-certified psychiatrist. For approximately five years, until his termination in November 2021, he worked as a locum tenens psychiatrist for PeaceHealth, working primarily out of SJMC. Throughout his time providing care to PeaceHealth patients he was jointly employed by PeaceHealth, PeaceHealth St. John and a third-party locums service. Dr. Adelstein's work on behalf of PeaceHealth was in a non-ministerial, secular capacity. At relevant times, Dr. Adelstein openly identified himself to Defendants as a whistleblower as that term is defined under Washington law.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

7.      Defendant PeaceHealth is a Washington-based, nonprofit corporation. It holds itself out to the region and the world as a faith-based healthcare system committed to "promoting personal and community health" and "treating each person in a loving and caring way." PeaceHealth professes "to serve the community and hold ourselves accountable to exercise ethical and responsible stewardship in the allocation and utilization of human, financial and environmental resources." PeaceHealth employs more than 15,000 individuals. The vast majority of those employees serve PeaceHealth in a non-ministerial capacity.

8.      Defendant PeaceHealth operates St. John Medical Center ("SJMC"), located in Cowlitz County. Approximately 1500 individuals work out of SJMC, most of whom in non-ministerial capacities. SJMC operates as a community hospital with 346 licensed beds, providing specialty services and programs in a variety of medical areas. Relevant to this case, SJMC maintains a behavioral health department that offers both in-patient and out-patient services.

9.      Defendant Dr. Axelrod is a citizen of Washington. He currently serves as a psychiatrist for Defendant PeaceHealth. He holds the senior leadership position of Systems Medical Director of Behavioral Health for all of PeaceHealth hospitals and clinics. Under Washington law, Dr. Axelrod is an employer.

## IV.      FACTUAL ALLEGATIONS

### A.  The Employment Promises of Defendants PeaceHealth and SJMC.

10.      PeaceHealth and SJMC promise a professional workplace grounded in trust, honesty and accountability. They claim "to promote workplace relationships that are healing, trusting and accountable, and to give people a voice in matters affecting their work. When major clinical and organizational decisions are required, we engage in a process to determine an appropriate ethical response consistent with our values." When unanticipated challenges arise, PeaceHealth and SJMC promise to commence "a formal Ethical Discernment process," in which a "collaborative

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

dialogue will be used to reach resolution." PeaceHealth claims that its "Ethical Discernment process" will guide participants to decisions consonant with the "Mission and Values" that PeaceHealth claims to hold dear. For Plaintiffs, those promises by Defendants were part of the terms and conditions of employment.

11.     At all times during their employment at PeaceHealth and SJMC, medical staff and advance practice professionals, including Plaintiff Ms. Brunelle, Plaintiff Dr. Adelstein, Defendant Dr. Axelrod and Dr. Jerad Shoemaker, were required to adhere to a Code of Conduct, promulgated by SJMC and/or PeaceHealth.

12.     Under the Code of Conduct, PeaceHealth employees are prohibited from engaging in:

- Verbal attacks;
- Verbal abuse, including criticism, addressed to its recipient in such a way to intimidate, undermine confidence, belittle, or imply incompetence;
- Inappropriate expressions of anger or loss of self-control, including, destructive venting of rage; as well as
- Retaliation against any individual who reports a concern about a medical staff member or advance practice professional.

13.     PeaceHealth and SJMC also maintain a professionalism policy that they require medical staff and advance practice professionals to abide by. Under that policy, medical staff are required to treat others with respect, courtesy, and dignity, and conduct themselves in a professional and cooperative manner. The policy provides examples of conduct prohibited by PeaceHealth medical staff, including:

- Use of abusive or threatening language, including belittling, berating, or intimidating criticism;
- Intentional misrepresentations to avoid responsibility for actions taken; and

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

- Retaliating against any individual who may have reported a quality and/or behavior concern.

The professionalism policy, and PeaceHealth's and SJMC's promise to enforce that policy across its medical staff and advance practice professionals was a term and condition of Plaintiffs' employment.

14.     Per the professionalism policy, all hospital employees and practitioners, including Plaintiffs, were required to report any inappropriate activity that they observed or were subject to. In consideration of that obligation, PeaceHealth and SJMC promised to:

- Thank them for reporting the matter and participating in PeaceHealth and SJMC's culture of safety and quality care;

- Inform them that the matter will be reviewed in accordance with the professionalism policy;

- Inform them that no retaliation is permitted against any individual who raises a concern; and,

- Inform them of their ongoing obligations to report any retaliation or other incidents of inappropriate conduct.

15.     Per PeaceHealth's and SJMC's professionalism policy, conduct that (i) is unwelcome and offensive to the target of, or any witness to, the conduct; (ii) could be considered harassment from the objective standpoint of a reasonable person; and (iii) is covered by state or federal laws governing discrimination (including whistleblower identity) constitutes identity-based harassment. Relevant to this case, under the policy, examples of conduct falling under the category of identity-based harassment include:

- Verbal threats;

- Physical interference with an individual's normal work movement; and

- Retaliating or threatening retaliation as a result of an individual's complaint.

16.     PeaceHealth promises its caregivers, volunteers, temps, contractors, medical staff, students, vendors, and other persons in the PeaceHealth and SJMC workplace, a work environment free from harassment. Consistent with its professionalism policy, PeaceHealth defines workplace harassment to include conduct based on any legally protected class or category. Thus, per PeaceHealth policy, conduct that is (i) unwelcome and offensive to the target or witness of that conduct; (ii) could be offensive to a reasonable person; and (iii) is based on the target's legally protected status, amounts to workplace harassment.

17.     The workplace harassment policy which PeaceHealth and SJMC promises to enforce defines retaliation to include any actions that are likely to dissuade a reasonable worker from making a complaint or raising a concern. Under the workplace harassment policy, examples of retaliation include:

- Adverse employment action including disciplining or terminating a caregiver for filing a claim of harassment;
- Excluding a complainant from a work-related meeting or conversation;
- Spreading gossip or rumors about a caregiver for filing a complaint; and
- Scrutinizing work or attendance more closely than that of others without justification.

18.     Under PeaceHealth's harassment policy any leader who has knowledge of potential harassment and does not address the situation is subject to corrective action.

*B.  Ms. Brunelle's record of outstanding performance and growth.*

19.     Ms. Brunelle began working for PeaceHealth as an Intake Specialist in or around February 1998. By 2013, she had risen to the position of clinical supervisor of outpatient behavioral health. At that time, her manager, now-Regional Director of Behavioral Health Services, Kyle Rahn, described Ms. Brunelle as a "high performer" who "exemplifies PH [PeaceHealth] values and strives to make our community a

better place. She is well respected in the community and among staff. She is an excellent employee and highly valued."

20.     A year later, in 2014, Mr. Rahn described Ms. Brunelle as "a very valuable resource for the BH [behavioral health] team. She is an excellent team player and has vision and organizational insight. She applies PH mission and values to everyday interactions with staff and patients."

21.     In a 2017 leadership evaluation, Mr. Rahn noted Ms. Brunelle's "great potential for leadership. She is an excellent communicator and thinker." In 2018, Ms. Brunelle was promoted to a managerial position in the behavioral health department. In that new role, Ms. Brunelle proved herself to be "a valued leader and * * * excellent example of PH mission and values."

22.     From 2018 through the end of her employment in April 2022, Ms. Brunelle continued to assume increasing levels of responsibility. In her role as a manager, her direct supervisor Mr. Rahn continued to commend Ms. Brunelle's performance as "an effective leader with exceptional relationship skills" (December, 2019). In Ms. Brunelle's final leadership assessment at PeaceHealth in 2021, Mr. Rahn described Ms. Brunelle as a manager with "a clear direction and good follow through [*sic*] on goals and outcomes." Mr. Rahn further noted that Ms. Brunelle is a "strong staff advocate" who has "good relationships with them. She leads by example."

   C.   *Dr. Adelstein's record of conscientious caregiving and service to SJMC and PeaceHealth.*

23.     Dr. Adelstein began serving SJMC and PeaceHealth in August 2016. During the approximately five years that he worked there as a locums tenens psychiatrist, he earned a reputation for providing outstanding clinical care.

24.     In April 2020, Mr. Rahn wrote Dr. Adelstein that he was a "valuable and welcomed" member of SJMC's "psychiatric team and family." In July 2021, Mr.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Rahn reiterated that sentiment, writing to Dr. Adelstein, "We so appreciate everything you do for us.  We owe you big time!"

25.     Program Director of Behavioral Health Services Holly Blondino affirmed that appreciation for Dr. Adelstein as late as July of 2021. Ms. Blondino told him,  "You are part of the team.  I know I am not the only one who values your clinical expertise, patient interactions and immense support of the nursing team when you are working with us."

26.     Prior to engaging in whistleblowing activities in 2021, Dr. Adelstein was regarded as an important member of the SJMC behavioral health team. Dr. Axelrod initially expressed interest in having Dr. Adelstein serve as a full-time psychiatrist in the unit.

27.     Initially Dr. Jared Shoemaker was assigned the task to work out an agreement with Dr. Adelstein for Dr. Adelstein to become the exclusive employee of PeaceHealth (rather than as an employee of PeaceHealth through a third-party locums company). However, Dr. Shoemaker's limited managerial and administrative talents threatened to frustrate any hope of reaching an agreement with Dr. Adelstein. Concerned that Dr. Adelstein would leave PeaceHealth and SJMC, Dr. Axelrod and Mr. Rahn instructed Ms. Brunelle to manage all employment-related communications with Dr. Adelstein. That task remained with Ms. Brunelle until PeaceHealth terminated Dr. Adelstein's employment.

28.     At the time that PeaceHealth and SJMC terminated Dr. Adelstein's locums contract in November 2021, Dr. Adelstein was one of the longest-tenured locums caregivers ever in SJMC's behavioral health unit.

29.     Throughout the duration of Dr. Adelstein's affiliation with Defendants PeaceHealth and SJMC, Dr. Adelstein's locums agency had only nominal involvement in Dr. Adelstein's relationship with Defendants. Dr. Adelstein would schedule his shifts directly with SJMC.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

30.     Defendants exercised control over Dr. Adelstein's daily duties by assigning patients to him; imposing administrative responsibilities on him; seeking input on administrative matters; and assigning him supervisory duties over medical students and other clinical staff, including nurse practitioners. Dr. Adelstein was required to represent the behavioral health unit in staffings with risk management, social work, emergency department, and various medical floors. When it was late in the day, towards the end of the shift, Dr. Shoemaker would often require Dr. Adelstein to assess particular patients, make difficult decisions and/or handle the most complicated elements of clinical care.

31.     In the inpatient behavioral health unit, the standard practice was to have two medical providers on shift-- at least one of whom was a medical doctor. In contrast to every other locums provider utilized during the relevant time period, Dr. Adelstein was often asked to work shifts by himself.

32.     During Dr. Adelstein's affiliation with PeaceHealth and SJMC, defendants provided Dr. Adelstein the tools necessary for him to perform his duties including providing him a company-owned laptop computer and a staff physician parking pass.

33.     Until Dr. Adelstein became a whistleblower, Defendants made a sustained effort to bring on Dr. Adelstein as a permanent member of the SJMC staff.

D.    *Ms. Brunelle blew the whistle about potential unethical and unlawful conduct by SJMC psychiatrist and Dr. Jerad Shoemaker.*

34.     In her position as a manager at SJMC, Ms. Brunelle was tasked with receiving and processing complaints of behavioral health patients who were dissatisfied with some aspect of their treatment.

35.     Ms. Brunelle was also expected to serve as a liaison between department employees including nurses and administrative staff on the one hand, and physicians on the other hand. She was further expected to provide a supportive

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

environment for caregivers which promoted high participation and collaboration. In that role, Ms. Brunelle became a resource for employees who had concerns about the conduct of physicians.

36.     In particular, in the time between her promotion to a managerial role and August of 2020, several employees brought forward to Ms. Brunelle a series of complaints and concerns about Dr. Shoemaker.  Dr. Shoemaker, at the time, held a Medical Director/Section Lead position in the Behavioral Health Department.

37.     In August 2020, Dr. Axelrod, who supervised Dr. Shoemaker, approached Mr. Rahn and Ms. Brunelle, stating that he had been hearing complaints and negative feedback about Dr. Shoemaker. Dr. Axelrod asked them to submit summaries of the complaints that they had heard from staff along with their observations of concerning behavior.

38.     In response to Dr. Axelrod's inquiry, Ms. Brunelle relayed a series of complaints that centered largely on matters of performance and basic competence. She notified Dr. Axelrod that Dr. Shoemaker did a poor job of communicating with staff; that his presence on the unit was unreliable; that he failed to read chart notes; that he regularly missed meetings or came unprepared; and that he had a practice of discussing politically divisive topics in public areas, during which he would take positions at variance with PeaceHealth policy (e.g. questioning mask mandates during the pandemic). Ms. Brunelle also noted that she received complaints about Dr. Shoemaker violating the law, including testifying in court about the wrong patient who was on an involuntary hold, and leaving the facility while a patient was receiving Spravato treatment (a powerful dissociative hallucinogenic therapy, for which the physician is required to remain on-site during the administration and for at least two hours after it is administered).

39.     In the months that followed, Ms. Brunelle received additional complaints about Dr. Shoemaker. In September 2020, a nurse practitioner (NP),

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Roderick Williams, tendered his notice of resignation, stating that he could no longer work with Dr. Shoemaker.

40.     In that same month, another NP, Tiffany Terry, reported to Ms. Brunelle, Dr. Simon Lai and Mr. Rahn that she had experienced gender-based discrimination from Dr. Shoemaker. In the Spring of 2021, Ms. Terry decided to leave PeaceHealth. She stated that "issues with Jerad [Shoemaker]" was the reason for her departure.

41.     Additionally, Ms. Brunelle received a number of patient and patient-family complaints of concerning behavior by Dr. Shoemaker. Those complaints included experiences of hostility towards LGBTQ+ patients, statements of disapproval toward patients availing themselves of available financial assistance for medical treatment, as well as unwelcome religious proselytizing. Ms. Brunelle reported these concerns to her supervisor Kyle Rahn; HR Business Partner Malisa Glaser; Dr. Simon Lai; and Dr. Axelrod.

42.     In May 2021, Ms. Brunelle blew the whistle about Dr. Shoemaker's unprofessional conduct towards a patient who received financial assistance for a surgery. Ms. Brunelle wrote to Dr. Lai, Ms. Glaser, Dr. Axelrod and Mr. Rahn, reporting that when told by the patient that she had received bridge assistance to help pay for a back surgery and hip replacement, Dr. Shoemaker had responded by stating disapprovingly "I pay for people like you." Ms. Brunelle reported that the patient complained, "He made me feel like I was taking food out of his kids' mouths."

43.     Dr. Axelrod immediately took steps to admonish Ms. Brunelle for engaging in protected whistleblowing activity and attempted to dissuade Ms. Brunelle from bringing her concerns to anyone other than him. When Ms. Brunelle recommended that PeaceHealth investigate the matter, including talking to the affected patient before addressing the concern with Dr. Shoemaker, Dr. Axelrod

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

intentionally undermined the efficacy of any investigation by discussing the matter first with Dr. Shoemaker.

44.    Dr. Axelrod then promised to call the affected patient. Despite multiple follow-ups from Ms. Brunelle on the matter, Dr. Axelrod refused to call the patient for months. When Dr. Axelrod finally did speak to the patient in October, 2021, the patient reported that Dr. Axelrod verbally attacked her for complaining about Dr. Shoemaker.

E.    *Dr. Adelstein blew the whistle about potential unethical and unlawful conduct by SJMC psychiatrist Jerad Shoemaker.*

45.    Independent from the concerns raised by Ms. Brunelle in 2020 and 2021, Dr. Adelstein also expressed grave concerns about unprofessional conduct by Dr. Shoemaker. In February 2021, Dr. Adelstein wrote to Dr. Axelrod about a torrent of complaints he was receiving about Dr. Shoemaker from other providers and staff. "Last week was my first week in outpatient, and though it was hectic it was made much easier by the incredible PARs and nursing staff. What concerns me are the complaints, criticism and concerns that I heard about Jerad [Shoemaker]. Every staff member (and several patients!) I met had something problematic to tell me -- some of which indicated a dangerous level of clinical negligence." Dr. Adelstein went on to report that reviewing some of Dr. Shoemaker's charts (on patients he was covering) gave Dr. Adelestein "more access to Jerad's clinical reasoning and decisions that frankly leave me wondering if I need to report him to the Washington State Licensing Board." Dr. Adelstein ended his email with an offer to "speak more" about the subject "at any time."

46.    As he did with the issues raised by Ms. Brunelle, Dr. Axelrod moved to insulate Dr. Shoemaker from any accountability. Rather than accept Dr. Adelstein's invitation to discuss the concerns of unprofessional conduct by Dr. Shoemaker, Dr. Axelrod moved to discredit Dr. Adelstein. Dr. Axelrod alleged that Dr. Adelstein was

engaged in a "witch hunt" supported only by "broad, unsubstantiated allegations of incompetent medical care."

47.     Dr. Aexlrod did not respond to Dr. Adelstein's repeated attempts to explain the troublesome pattern of unprofessional conduct that presented an ongoing risk to patient safety and to PeaceHealth. Instead, Dr. Axelrod complained to others that Dr. Adelstein had used the word "dangerous" in his characterization of Dr. Shoemaker's conduct, because it implied a duty to take affirmative steps to address the conduct.

F.   *In April 2021, Dr. Adelstein blew the whistle on risk manager Dan Huhta and PeaceHealth.*

48.     The medical question of a patient's capacity to make a decision for oneself is a limited and timebound matter. It is a fact-intensive inquiry that involves assessing the particular medical decision being placed in front of the patient; the patient's understanding of that decision; the patient's appreciation for the risks involved; and the patient's ability to reason through those risks. Evaluation of decisional capacity must be based on a specific decision at a specific time. If there is a question about the patient's capacity the treating care provider should consider the factors that come to bear on the patient's capacity each time that provider intends to override a patient's stated wishes on a given matter, or cannot ascertain what the patient's wishes are.

49.     A basic tenant of treating someone who is medically incapacitated is that the care provider should make best efforts to restore the patient to capacity to make future decisions for themself. Further, as the care provider addresses the underlying reasons impairing the patient's capacity, the care provider must frequently re-evaluate the patient's decisional capacity.

50.     In contrast to the question of capacity to make a given medical decision, the question of a patient's competency to make decisions for themself refers

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

to a broader set of decisions over a longer period of time. As a matter of law, in Washington, a declaration that an individual is incompetent to make medical decisions requires a judicial process in which the patient's history is reviewed and, if found to be incompetent, the patient is assigned a surrogate decision maker (e.g. a legal guardian).

51.     Because of the constitutional liberty interests at stake, only courts, and not care providers, have the legal authority to declare an invididual incompetent to make decisions on their own behalf.

52.     On or about April 7 2021, PeaceHealth Clinical Risk Manager Dan Huhta called Dr. Adelstein, asking him to perform a "capacity evaluation" on a patient. Dr. Adelstein responded that he was happy to assist, and asked Mr. Huhta what specific decision needed to be made in which the patient's capacity was called into question.

53.     Mr. Huhta responded that he wanted Dr. Adelstein to declare that the patient didn't have capacity to make medical decisions generally. When Dr. Adelstein responded that what Mr. Huhta was seeking was a declaration of incompetence, and that Dr. Adelstein did not have the legal authority to declare the patient incompetent, Mr. Huhta attempted to bully Dr. Adelstein.

54.     Mr. Huhta raised his voice and falsely told Dr. Adelstein that "this is the way it's done in Washington" state, that "it's in the statute," and that was how PeaceHealth handled such matters. Mr. Huhta went on to try to convince Dr. Adelstein that Dr. Adelstein had in fact done the same thing before. When Dr. Adelstein responded that in fact he had not ever unilaterally declared someone to lack capacity to make medical decisions for themself, Mr. Huhta responded that Dr. Adelstein needed "to find a way forward, otherwise we'll have to go through this process every time a decision has to be made."

55.     Consistent with his legal and medical obligations Dr. Adelstein did not declare the patient to lack capacity for medical decision making.

56.     Upon information and belief, following Dr. Adelstein's refusal to take the unlawful step of declaring a patient generally to lack capacity to make medical decisions, Mr. Huhta intimidated a hospitalist to make the generalized finding.

57.     The following day, Dr. Adelstein blew the whistle on Mr. Huhta. Dr. Adelstein described the encounter with Mr. Huhta and the violations of law consequent to Mr. Huhta's description of how capacity evaluations are done at PeaceHealth, on PeaceHealth's confidential Safe-to-Share ("S2S") platform, in which staff are encouraged to come forward and report all incidents so that they can be safely addressed without fear of retaliation.

58.     In his S2S, Dr. Adelstein recounted Mr. Huhta's behavior and his concerns about PeaceHealth engaging in this unlawful practice generally. In his S2S report, Dr. Adelstein explained that the physician treating the patient has the necessary ability to assess on a decision-by-decision basis what the patient had capacity to decide for themself. Dr. Adelstein further explained if there is a given decision to be made and it is not obviously and intuitively apparent that the patient lacks capacity to make that decision, then he was available to assist whenever necessary. "I encourage the Clinical Risk Manager to take more consideration of patients' rights before attempting to dictate care. Broadly and arbitrarily determining that someone 'lacks capacity to make medical decisions' is NOT 'the way it's done' at Peacehealth, in Washington State, or anywhere in this country. And if it is, then we have a much bigger problem."

59.     Following that Safe2Share report, Dr. Adelstein met with Mr. Huhta's supervisor in the risk management department. That person in conjunction with Ms. Brunelle and other PeaceHealth administrators including the hospital chief administrative officer, correctly determined that PeaceHealth's practice of having

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

doctors declare patients to lack capacity to make medical decisions generally was not consistent with its legal obligations.

60.     Based on those findings, PeaceHealth instructed Dr. Axelrod to refine and clarify policy surrounding capacity evaluation that clarified that such assessments must be done on a discrete, issue–by–issue basis.

61.     Upon information and belief, PeaceHealth has not developed that policy. Further, upon information and belief psychiatrists at SJMC including Dr. Shoemaker have continued to declare patients generally to lack capacity to make medical decisions. Since Dr. Adelstein blew the whistle in April 2021, such declarations have been used to hospitalize patients at PeaceHealth against their will. Based on these declarations of medical incapacity Dr. Shoemaker and PeaceHealth have filled SJMC medical beds and have submitted false claims for payment to the federal government.

62.     Additionally, PeaceHealth instructed Mr. Huhta to personally apologize to Dr. Adelstein. Mr. Huhta never did so. That refusal to acknowledge his unprofessional conduct, reasonably caused Dr. Adelstein to fear bringing further concerns forward to the clinical risk manager.

63.     Shortly after reporting the conduct of Mr. Huhta and the unlawful practice of PeaceHealth, Dr. Adelstein faced retaliation from Dr. Axelrod and Mr. Huhta. That retaliation included undue scrutiny of Dr. Adelstein's billing practices, and the cancellation of Dr. Adelstein's previously scheduled shifts.

   G. *In May 2021 Jerad Shoemaker submitted a charge for a patient he had not seen.*

64.     On May 24, 2021, Dr. Shoemaker submitted a charge for a patient that he did not actually see. Dr. Shoemaker self-reported to Dr. Axelrod and the unit nurse that he "missed a patient" who was his responsibility to see and provide care for. Dr. Axelrod informed Holly Blondino and Kyle Rahn of the situation. Ms.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Blondino forwarded the email to Ms. Brunelle, asking for guidance about what to do in response. Ms. Brunelle told Ms. Blondino that Dr. Shoemaker should report the incident in S2S, an internal electronic incident reporting system.

65.     Dr. Shoemaker filed an S2S report. In that report Dr. Shoemaker stated that he did not directly assess the patient, but had placed a "short note" in the patient's medical file. Ms. Brunelle looked up the progress note, which made no reference to the fact that Dr. Shoemaker had not in fact seen the patient on that day, but was written to create an impression that he had seen the patient. Ms. Brunelle further discovered that, despite not having seen the patient, Dr. Shoemaker submitted a billing charge for services related to the patient.

66.     When Ms. Brunelle learned that Dr. Shoemaker had billed for a patient that he admitted he had not seen, she told her supervisor Mr. Rahn that they would need to get the medical charge reversed and the chart note redacted. Ms. Brunelle and Mr. Rahn took those steps and then Ms. Brunelle reported the matter to Molly Brown in PeaceHealth's office of Organizational Integrity ("OI").

67.     On June 8, 2021, Dr. Axelrod, Ms. Brown, Mr. Rahn, Ms. Glaser and Ms. Brunelle met to discuss the issue of Dr. Shoemaker billing for a patient he had not seen.

68.     During that meeting, Dr. Axelrod took steps to insulate Dr. Shoemaker from culpability by insisting on meeting with Dr. Shoemaker without anyone else present. During that June 8 meeting, Dr. Axelrod stated that his greatest concern about the incident was Dr. Shoemaker's failure to clearly state in the chart note that Dr. Shoemaker had not actually seen the patient.

69.     On or about June 9, 2021, Dr. Axelrod and Dr. Shoemaker met without anyone else present. Dr. Axelrod subsequently reported back to Ms. Brown, Ms. Glaser, Mr. Rahn and Ms. Brunelle about what he and Dr. Shoemaker discussed.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

70.     According to Dr. Axelrod, Dr. Shoemaker, who had been a physician at PeaceHealth for more than nine years, had spent several years in a director level position, and had sat through many trainings relating to legal billing requirements, was somehow unsure of whether or not he could bill for a patient he had not seen. Further, rather than taking the steps to get clarification on this issue, according to Dr. Axelrod, Dr. Shoemaker simply decided to bill for the service that he had not provided.

71.     Ms. Brunelle asked Dr. Axelrod if Dr. Shoemaker provided an explanation for why he did not acknowledge in his chart note that he had not seen the patient. Dr. Axelrod responded by stating that he did not ask that question, despite it ostensibly being his greatest concern.

72.     On June 17, Ms. Brunelle again met with Dr. Axelrod, Ms. Brown and Ms. Glaser to discuss the billing issue. Dr. Lai also attended the meeting. During the meeting Dr. Axelrod accused Ms. Brunelle of attempting to "entrap" Dr. Shoemaker.

73.     Also in June 2021, Dr. Adelstein learned from staff members that Dr. Shoemaker had been billing for patients Dr. Shoemaker had not seen. Dr. Adelstein submitted a separate report to OI that he had heard discussions with staff members in which staff had reported that Dr. Shoemaker was billing charges for patients he had not seen and that Dr. Shoemaker did not think this was a problem.

74.     Separately, by reporting and requesting investigations, Plaintiffs undertook efforts to stop one or more violations of the False Claims Act by Dr. Shoemaker.

75.     In those requests for investigations, Plaintiffs asked OI and others to conduct an audit of Dr. Shoemaker's billing practices to determine whether and how often he had submitted bills for patients he had not seen. Defendants refused to conduct such an audit.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

76.     In the months that followed, Plaintiffs discovered other billing practices by Dr. Shoemaker that resulted in the submission of false claims to the Centers for Medicare and Medicaid Services.

>   H. *In the summer of 2021, following Dr. Adelstein's whistleblower complaints, Defendants began to retaliate against him.*

77.     Prior to Dr. Adelstein's complaints about Dr. Shoemaker, Dr. Axelrod and PeaceHealth engaged in a sustained effort to deepen its relationship with Dr. Adelstein. In February 2021, Dr. Axelrod reached out to Dr. Adelstein to express hope that Dr. Adelstein could provide coverage during several weeks of "major needs we have going forward." Dr. Adelstein replied the same day to confirm his availability.

78.     Until the reports of billing fraud by Dr. Shoemaker and the complaints about improper declarations of patients lacking capacity to make medical decisions, Dr. Axelrod took pains to take maximum "advantage of Adelstein working solo." Dr. Axelrod noted that he had Dr. Adelstein scheduled with locums dates through October 31, noting to administrators working on the in-patient coverage schedule that Dr. Adelstein "is very efficient and we are confident he will continue to be reliable and 'work hard.'"

79.     Shortly after Dr. Adelstein blew the whistle regarding Dr. Shoemaker, Dr. Axelrod moved to discontinue Dr. Adelstein's presence on the unit. On June 15, Dr. Axelrod informed Dr. Adelstein that PeaceHealth had engaged a new locums nurse practitioner, Jennifer Urune. Based on the presence of this other, untested, less qualified locums provider, who at that time had not even completed orientation, Dr. Axelrod informed Dr. Adelstein that he would not be needed for in-patient coverage after July. Dr. Axelrod canceled the shifts that Dr. Adelstein had already been scheduled to work at SJMC in September and October 2021.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

80.     On July 9, in a phone call, Dr. Axelrod informed Dr. Adelstein, "we no longer need you after August. To be honest we don't even need for the shifts you're scheduled to work next week and in August but I can't cancel because it's less than 30 days' notice" (as required under Dr. Adelstein's locums agreement).  Dr. Adelstein responded that he could not understand why Dr. Axelrod would remove dates in September and October that had been agreed upon and confirmed with both Dr. Adelstein and his locums company.

81.     Dr. Axelrod's abrupt disregard for their history of working together was shocking to Dr. Adelstein. Upon reflection immediately following the conversation was Dr. Adelstein able to make sense of the sudden callousness of Dr. Axelrod. Dr. Adelstein understood that Dr. Axelrod was pushing Dr. Adelstein out in an effort to cover up Dr. Shoemaker's and PeaceHealth's profitable misdeeds, including fraudulent billing.

82.     Having been told that his services were no longer needed, Dr. Adelstein initially intended to perform just the amount of work necessary to satisfy his contractual obligations, and see only one patient per shift. On July 12, having heard that Dr. Adelstein intended to see one patient per shift, Dr. Axelrod called Dr. Adelstein in a state of rage. He ordered Dr. Adelstein to see eight patients per day, stating, "I am your medical director!" Dr. Adelstein replied that Dr. Axelrod had said that he was no longer needed. Dr. Axelrod told Dr. Adelstein that he was "imagining things" and that Dr. Axelrod had not told him that he was no longer needed, and began to rant at Dr. Adelstein.

83.     Dr. Adelstein calmly stated, "I think I know what is happening, and I think I know why you canceled my shifts. I think you are covering up for Jerad [Shoemaker]."

84.     Dr. Axelrod accused Dr. Adelstein of "blackmailing" him. Dr. Axelrod further threatened retaliation against Dr. Adelstein, stating that he would "file a

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

grievance against you that will haunt your record forever." The conversation concluded with Dr. Axelrod screaming, "Are you going to see eight patients a day-- yes or no?" Dr. Adelstein responded that the situation was more complicated than that. Dr. Axelrod cut him off, stating, "That's a no!" and hung up.

85.     Within minutes of being hung up on, Dr. Adelstein sent a text message to Dr. Axelrod assuring him that he would see eight patients per shift. Dr. Axelrod thanked him. Regardless of how he was being treated, Dr. Adelstein continued to assure that PeaceHealth patients received a high level of care from him.

86.     Immediately following the call with Dr. Adelstein, Dr. Axelrod called Ms. Brunelle and accused her of colluding with Dr. Adelstein at the expense of him and Dr. Shoemaker. Ms. Brunelle told Dr. Axelrod that she was not colluding with Dr. Adelstein, that she had told Mr. Rahn and Dr. Axelrod that she had reported her concerns about Dr. Shoemaker's May 2021 billing, and that Dr. Adelstein had "come to the unit more than two weeks after I had reported it and heard multiple staff discussing it on the floor and he reported anonymously as he felt he was required to do as a mandated reporter. His reporting was by his choice and I believe he told you that."

87.     During that conversation, Ms. Brunelle reiterated her frustration about Dr. Axelrod's failure to properly investigate Dr. Shoemaker, both in terms of patient complaints and the billing issues. She expressed opposition to the fact that Dr. Axelrod, in the presence of OI, human resources, and Dr. Lai, had accused Ms. Brunelle of attempting to "entrap" Dr. Shoemaker.

88.     Dr. Axelrod stated that he "thought about the word at the time, knowing that it had a strong meaning and decided that it was the right word." Dr. Axelrod asserted that he thought Ms. Brunelle disagreed with the outcome of the OI investigation, so was still searching for other ways to "sabotage" Dr. Shoemaker. Dr.

Axelrod made no mention of the patients who could face harm as a result of Dr. Shoemaker's practices.

89.     On July 15, Dr. Adelstein reached out to Ms. Glaser to lodge a formal complaint about his concerns regarding Dr. Shoemaker and Dr. Axelrod's threatening behavior. When Dr. Adelstein reached out, he emphasized his fearfulness and his belief that Dr. Axelrod would likely retaliate against him.

90.     On or about July 15, 2021, Dr. Adelstein met by phone with Ms. Glaser and Chief Medical Officer Shaun Harper. During his call with Ms. Glaser and Dr. Harper, Dr. Adelstein detailed the whistleblowing activities described above and the retaliation that he suffered as a result of those protected whistleblowing activities. He also told Ms. Glaser and Dr. Harper that he was very concerned about further retaliation from Dr. Axelrod. He expressed that he was frightened, confused and felt very vulnerable. Dr. Harper and Ms. Glaser reassured him that PeaceHealth has strong policies against retaliation. They promised Dr. Adelstein that he would be protected for having had the courage to come forward with his concerns.

91.     In the weeks and months that followed, despite PeaceHealth maintaining policies that promised to keep complainants informed about the basic status of investigations, Dr. Adelstein heard nothing back. He repeatedly reached out to Dr. Harper and Ms. Glaser for information about what was happening. Other than terse responses that PeaceHealth was still investigating, Dr. Adelstein heard nothing.

92.     Nor was there anyone, other than Ms. Brunelle, whom in the coming months PeaceHealth would take steps to attempt to prevent from speaking with Dr. Adelstein, to whom Dr. Adelstein could go with his concerns. He was excluded from the PeaceHealth workplace for attempting to ensure PeaceHealth complied with law and policy, without being provided any meaningful information.

93.     On July 22, Ms. Glaser and Dr. Harper met with Ms. Brunelle. The stated reason for the meeting was to discuss Dr. Adelstein's complaint about Dr.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

Axelrod's retaliation. However, during the conversation, neither Dr. Harper nor Ms. Glaser asked any questions about Dr. Axelrod's behavior. Instead, they only focused on what Ms. Brunelle had heard from staff and patients about Dr. Shoemaker. Dr. Harper concluded the meeting stating that there was a great deal to unpack and that they may need to speak to her again.

94.     Following that meeting on July 31, Ms. Brunelle wrote to Dr. Harper, Ms. Glaser and HR Business Partner Katie Murphy. In the email Ms. Brunelle stated that there was additional information about Dr. Adelstein's complaint, Dr. Shoemaker's conduct, and Dr. Axelrod's behavior that needed to be addressed. Ms. Brunelle included several attachments and a detailed timeline laying out her concerns of potential unlawful conduct by Dr. Axelrod, Dr. Shoemaker and PeaceHealth. She concluded her email stating, "I am trusting you all with this and hoping that you can glean what you need from it, while keeping in mind that I am very vulnerable and worried about the retaliation that may come to me from sending it."

95.     Despite the existence of policies promising whistleblowers prompt investigations, protections from retaliation, a notice of findings, and an explanation of the right to appeal the results of the investigation, Ms. Glaser, Dr. Harper and Ms. Murphy never responded to Ms. Brunelle's July 31 email, not even to acknowledge receipt.

96.     In the months that followed, Dr. Adelstein continued to ask about the status of the investigation into his complaints. Ms. Glaser responded with bland assurances that PeaceHealth would be looking into his concerns and would follow up if it had any questions.

97.     In August 2021, the behavioral health unit predicted a need for additional behavioral health providers in the coming months. Recognizing the need for additional provider help, Director of Behavioral Health Services Ms. Blondino asked Dr. Axelrod, "Can we hold off on cutting ties with Dr. Adelstein?" Dr. Axelrod

responded, "I have information you do not, Dr. Adelstein will not be working with us again after nex [sic] week."

98.     On information and belief, Dr. Axelrod told others within PeaceHealth that Dr. Adelstein would not be working any further at PeaceHealth and that he was no longer a physician in good standing with the institution.

99.     On August 23, Ms. Brunelle and Ms. Glaser exchanged several emails regarding Dr. Adelstein's situation. In that correspondence, Ms. Brunelle raised concerns that the cancellation of Dr. Adelstein's shifts in September and October looked like retaliation, especially in light of the fact that he was hearing from other providers that he would not be allowed to perform work for PeaceHealth in any capacity. Ms. Glaser stated that PeaceHealth was still investigating Dr. Adelstein's allegations that his shifts were canceled due to retaliation, and that no decision had been made regarding Dr. Adelstein's continued opportunities to work at PeaceHealth.

100.     That same day on August 23, locums provider Jennifer Urune  (whose arrival had served as the purported justification for Dr. Axelrod informing Dr. Adelstein that he was no longer needed at SJMC), provided notice she was ending her relationship with SJMC effective immediately. This aggravated the ongoing need for locums help. Dr. Axelrod wrote, "I've asked [locums coordinator] Pachia [Dettmann] to look for another locums, with this news it could be NP (7 on, 7 off) and/or MD (more flexible, but probably prefer 7 on, 7 off)."

101.     Ms. Brunelle forwarded Dr. Axelrod's email to Ms. Glaser and Dr. Harper, suggesting that "We may want to consider this [need for locums help] when deciding what to do with Dr. Adelstein." Ms. Glaser thanked Ms. Brunelle for the email but said nothing more.

102.     On September 19, Dr. Axelrod wrote to Mr. Rahn and Ms. Brunelle regarding the critical staffing shortage. He noted that the locums coordinators were

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

attempting to "source additional candidates but the market is challenging right now and since it is late September, we are unlikely to have a candidate by January when we will start the new schedule." As a result of the staffing crisis, inpatient would need to be scaled from 17 beds to a 10 bed unit "plus a VERY limited consult service."

103.    Dr. Axelrod acknowledged the deleterious consequences of this shift. "Obviously it will have an impact on staffing and morale. Unfortunately, the inability of PH to recruit inpatient psychiatrists and qualified NPs long term has left us no choice. Additional burdens on the existing psychiatrists will likely lead to en masse defections and the collapse of the department."

104.    Notwithstanding those dire prognostications, Dr. Axelrod remained unwilling to change his position regarding Dr. Adelstein, remaining adamant that SJMC did not need him. Dr. Adelstein was not contacted about locums availability or informed that he would be barred from working at PeaceHealth in the future.

105.    On October 12, Dr. Harper called Dr. Adelstein to inform him that the investigation had concluded and the finding was there had been no retaliation. Dr. Harper offered that the reason Dr. Adelstein's shifts had been taken away and that Dr. Adelstein had not been offered additional shifts was because SJMC had decided to move away from hiring locums.

106.    In fact, in the months since canceling Dr. Adelstein's shifts, SJMC behavioral health increased its reliance on locums caregivers.

I.    *Contemporaneous to his retaliation against Dr. Adelstein, Dr. Axelrod engaged in retaliatory behavior towards Ms. Brunelle.*

107.    On July 8, Ms. Brunelle met with her supervisor Mr. Rahn, seeking his support to address her concerns that Dr. Adelstein was experiencing retaliation and that Dr. Shoemaker was not being held accountable for billing a patient he had not seen. Mr. Rahn told Ms. Brunelle that she needed to "quit asking questions" and that "your problem is that you can't just accept there aren't consequences and let it go."

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

108.     Throughout July and August 2021, Ms. Brunelle continued to receive complaints from providers regarding Dr. Shoemaker. Dr. Axelrod continued to instruct Ms. Brunelle to bring those complaints only to him. In what would be a frustrating pattern, caregivers, staff and patients would bring complaints to her about Dr. Shoemaker, she would relay those complaints to Dr. Axelrod, and Dr. Axelrod would summarily dismiss the concerns as the product of "confirmation bias" and staff antipathy towards Dr. Shoemaker.

109.     In August 2021, Ms. Brunelle reached out to SJMC's Chief Administrative Officer Cherelle Montanye. Ms. Brunelle informed Ms. Montanye that she was concerned that complaints about Dr. Shoemaker were not being addressed, and that Dr. Adelstein had been subjected to retaliation for raising concerns about Dr. Shoemaker.  Ms. Montanye instructed Ms. Brunelle to bring those issues to PeaceHealth's System Director of Behavioral Health, Dr. Erica Torres.

110.     Ms. Brunelle met with Dr. Torres on August 24. At the meeting, Ms. Brunelle outlined her concerns with the department. She stressed that two issues were creating morale issues and division amongst the staff. First, was a lack of accountability regarding Dr. Shoemaker. Time and again, staff brought complaints, only to have them not addressed. The second was the cancellation of Dr. Adelstein's shifts, which had caused a great deal of frustration among staff who had held Dr. Adelstein in high regard, and who felt the brunt of the need for locums help and the inexplicable refusal to utilize Dr. Adelstein.

111.     Ms. Brunelle explained that for staff, it was evident that Dr. Axelrod was applying a double standard. They had brought forward complaint after complaint about Dr. Shoemaker only to have Dr. Axelrod heap praise on him in response. Then Dr. Adelstein was being cast out of the organization without a single criticism of his work for shining a light on the problems with Dr. Shoemaker. Each time either of these was reinforced it eroded staff morale.

112.    The August 24 conversation ended before Ms. Brunelle had a chance to share all of her information. Despite having only a partial understanding of Ms. Brunelle's concerns, Dr. Torres announced that she would be reaching out to Mr. Rahn and Dr. Axelrod to begin "problem solving." She promised to get the rest of the story in a meeting the following week. (She did not in fact set a follow-up meeting until nearly a month later.)

113.    On September 13, Mr. Rahn requested a meeting with Ms. Brunelle. Mr. Rahn told her that he heard from Dr. Torres that Ms. Brunelle was having problems with him. Ms. Brunelle expressed frustration about being placed in a position where she received concerns from staff and patients but was powerless to foster accountability. In particular she expressed to Mr. Rahn dissatisfaction with Mr. Rahn's response to the issues with Dr. Shoemaker. Mr. Rahn had instructed Ms. Brunelle for months that it was her job to make Dr. Shoemaker successful and encouraged Ms. Brunelle to simply "trust Rob [Axelrod]." Ms. Brunelle responded that she did not in fact trust that Dr. Axelrod was adequately holding Dr. Shoemaker accountable, which left Ms. Brunelle to clean up the messes that followed.

114.    On information and belief, around that same time, Dr. Torres also discussed Ms. Brunelle's concerns with Dr. Axelrod.

115.    In September, 2021, in retaliation for raising concerns about Dr. Shoemaker and the retaliation towards Dr. Adelstein, Dr. Axelrod began actively working to diminish Ms. Brunelle's position in the department, and taking steps to keep Ms. Brunelle out of essential conversations.

116.    For example, on September 13, Julie Kell sent an email to Ms. Brunelle (who supervised her), Ms. Blondino, Mr. Rahn and Dr. Axelrod regarding whether SJMC accepted cross-county patients who tested positive for methamphetamines. Dr. Axelrod replied all, but removed Ms. Brunelle from the conversation and provided a clarification. Ms. Kell responded to the clarification,

including Ms. Brunelle again in the thread. Dr. Axelrod, again replied all, but *again* deleted Ms. Brunelle from the conversation.

117.    On September 17, Dr. Axelrod escalated his retaliation efforts. He sent an email to Ms. Brunelle, copying Ms. Glaser and Mr. Rahn, in which he prohibited Ms. Brunelle from discussing her concerns about him (which primarily concerned Dr. Axelrod's retaliatory behavior) with anyone other than her supervisor (who, as it happens, had instructed her to "quit asking questions"). Dr. Axelrod went on to state that if she did not abide by his instructions, he was prepared to take action against her and PeaceHealth.

118.    Following this direct threat from Dr. Axelrod, Ms. Brunelle met with Ms. Glaser and Dr. Harper on September 27. During that meeting Dr. Harper acknowledged that Dr. Axelrod's attempts to silence Ms. Brunelle were retaliatory. Ms. Brunelle responded that the email was but one example of a pattern by Dr. Axelrod. She emphasized Dr. Axelrod's acting to muzzle her efforts to address the concerning and potentially unlawful behavior of Dr. Shoemaker.

119.    During the meeting, Ms. Brunelle explicitly connected the abuse she had endured to the retaliation that Dr. Adelstein had experienced. Ms. Brunelle said words to the effect of, "What happened to Jon [Adelstein] is now happening to me. Jon was in Rob's good graces until he started saying that Rob needed to address concerns about Jerad [Shoemaker] and then Jon was forced out. As soon as I started saying that we need to do something about Jerad, I became a target."

120.    During that meeting Dr. Harper stressed that PeaceHealth had failed to live up to its ideals and had let Ms. Brunelle down. Ms. Brunelle was right to raise her concerns, and PeaceHealth had failed to maintain an environment where it was safe to do so.

121.    Ms. Glaser told Ms. Brunelle that she was completing her investigation into Dr. Adelstein's and Ms. Brunelle's complaints. Upon the completion of that

investigation, Ms. Glaser stated they would work to repair the relationship between Ms. Brunelle and Dr. Axelrod.

122.    Ms. Brunelle expressed that she was afraid of Dr. Axelrod and fearful of encountering him in work spaces. Ms. Glaser instructed Ms. Brunelle to physically confine herself to her office to avoid any chance encounter with Dr. Axelrod. For the remainder of her time at SJMC, Ms. Brunelle worked under this directive to confine herself to her office. Doing so left Ms. Brunelle feeling isolated and vulnerable. The confinement undermined her ability to work effectively and diminished her standing among colleagues and the staff who reported to her.

123.    Staff were left to wonder why Ms. Brunelle was suddenly not around, why she had become unresponsive to, for example, patient complaints about Dr. Shoemaker. When Ms. Brunelle asked for guidance about what to tell staff wondering why this manager who for decades had promptly and effectively addressed problems brought to her was now suddenly unavailable, the response she got back was to tell them, "I have a lot going on right now; I appreciate your concern."

124.    In October, Ms. Glaser, Dr. Harper and Dr. Torres attempted to schedule a meeting with Ms. Brunelle and Dr. Axelrod. However, Dr. Axelrod declined the invitation and no other meeting was scheduled.

125.    Dr. Axelrod was the source for much of the information that Ms. Brunelle needed to perform her job. He was the source of information for things impacting the staff from the service line, the hospital medical reporting structure and the clinic medical reporting structure.  Because Dr. Axelrod held several distinct leadership positions at the hospital, no other behavioral health physicians attended meetings in these reporting lines.  It was expected that Dr. Axelrod would provide Ms. Brunelle with pertinent information that was coming from those meetings. Instead, in retaliation for Ms. Brunelle's whistleblowing, Dr. Axelrod stopped sharing

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

information with her, exercising his power to prevent her from being able to fully or effectively do her job.

126.    On October 6, Ms. Brunelle sat down with Dr. Torres, Dr. Harper, and Mr. Rahn. Ms. Brunelle again expressed her fear of Dr. Axelrod, and her inability to walk around the facility and perform her job duties as a result. Dr. Torres was dismissive. When Ms. Brunelle asked Dr. Torres to acknowledge the fact that Dr. Axelrod had threatened her, Dr. Torres refused to do so, stating that she did not believe such an acknowledgement would help the situation.

127.    At that point in the conversation, Dr. Harper explicitly acknowledged that Dr. Axelrod's threatening email of September 17 was retaliatory and a violation of PeaceHealth policy. On behalf of PeaceHealth, Dr. Harper apologized for Dr. Axelrod's behavior. PeaceHealth did not however remediate the problem.

128.    Ms. Brunelle next reached out to Vice President of Human Resources Shawna Unger. The two met on October 12, the same day that Dr. Harper told Dr. Adelstein that he saw no evidence of retaliation.

129.    During the October 12 meeting between Ms. Unger and Ms. Brunelle, Ms. Unger expressed that Ms. Brunelle's complaints had been poorly handled. Astonishingly, Ms. Unger reported that no one at PeaceHealth was in charge of investigating Ms. Brunelle's concerns.

130.    Ms. Unger and Ms. Brunelle met a second time on October 18. At that second meeting, Ms. Brunelle emphasized the parallels between her situation and Dr. Adelstein's. As Ms. Brunelle explained, she and Dr. Adelstein both experienced Dr. Axelrod's vindictiveness when they attempted to address problems relating to Dr. Shoemaker.

131.    Ms. Unger repeated Dr. Harper's uncompelling excuse that SJMC was "moving away from locums" which led to the cancelation of Dr. Adelstein's shifts. Ms. Brunelle responded that that explanation made no sense. SJMC had not moved

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

away from locums; Dr. Adelstein had been replaced by a locums who was less educated and less experienced, and who was informing staff that she was overwhelmed by the amount of time she was spending at SJMC. In fact, that locums quit and SJMC needed to hire yet another locums to fill the vacancy it created by botching the response to Dr. Adelstein's whistleblowing. Meanwhile Dr. Adelstein remained available and willing to take on additional work at SJMC.

132.    Ms. Brunelle reiterated that she felt trapped in her office out of fear of encountering Dr. Axelrod. Ms. Unger closed the meeting stating that she would work to arrange a mediated meeting between Dr. Axelrod and Ms. Brunelle, and that she would work with Dr. Harper to ensure that Ms. Brunelle had an opportunity to (again) share the details of the evidence that she had about her situation and Dr. Adelstein's situation, and the retaliation that both had suffered.

133.    Ms. Brunelle told Ms. Unger that it was important for Ms. Unger to hear Dr. Adelstein's complaints in conjunction with Ms. Brunelle's complaints. Without having the benefit of both of their experiences, it was not possible to get a complete understanding of Dr. Axelrod's retaliatory conduct.

134.    Each of those promises by Ms. Unger would be broken.

J.    *Defendants' completion of their retaliation against Dr. Adelstein.*

135.    On October 18, Ms. Brunelle made an email introduction between Ms. Unger and Dr. Adelstein, so that Dr. Adelstein could share directly evidence of the retaliation that he had experienced.

136.    On October 22, Ms. Unger suggested that she, Dr. Harper and Dr. Adelstein schedule a time to go over the events that led to the cancellation of his shifts.  Dr. Adelstein promptly responded that he would like for Ms. Brunelle to be included in the conversation, as "[s]he has some additional information and has seen both sides."

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

137.    Following that request, Ms. Unger stopped responding to Dr. Adelstein. On October 22, Ms. Unger emailed Ms. Brunelle, stating that she wanted to meet with Ms. Brunelle and Dr. Harper to "walk through the information" in advance of her call with Dr. Adelstein, but then never followed through on scheduling the meeting to do so.

138.    Dr. Adelstein followed up with an email on October 28 and again on November 2. Ms. Unger did not bother to respond.

139.    On November 12, 2021 Dr. Adelstein wrote to Ms. Unger seeking "to file a formal complaint about how HR and the administration" handled his complaint. He stressed that Dr. Harper made findings about his complaints of retaliation based on an incomplete record. "This mirrors my initial concerns about Dr. Shoemaker: when I tried to bring them forward, I was ignored, threatened and retaliated against. There have been patient and workplace safety issues now ongoing over 5 years. I was hopeful that HR could resolve this or at least hear my concerns, but this does not seem to be the case. I am not familiar with the org chart or processes; can you please direct me to the right person or tell me to whom I can report this complaint about HR and behavioral health/ Peacehealth admin?"

140.    Ms. Unger did not bother to respond.

141.    On November 19, Ms. Brunelle received an email stating that Dr. Adelstein had resigned his medical privileges from SJMC. This statement was false. Dr. Adelstein had not resigned his privileges.

142.    On November 23, Dr. Adelstein wrote to PeaceHealth, stating that he had not resigned his privileges and that for the time being he preferred to maintain his privileges and certificate of insurance.

143.    The following Monday, Dr. Adelstein received an email from Diane Lemonds, stating in part, "PeaceHealth has made the decision to no longer utilize

your services.  We followed our normal process and notified your locums agency, Todd Dudley of this in late October."

144.    Dr. Adelstein responded, in part, "This is the first I'm--or my locums agency--is hearing of this, a month later.  I believe the normal process is to notify me, and the last I heard from both Dr. Harper and Dr. Axelrod was the possibility of ongoing opportunities.  Then, on November 23, I received notice (attached) that my 'voluntary resignation' (of which I had no part) was acknowledged.  Can you please explain who made this decision, what their reasoning was, and what the 'normal process' is for this?"

145.    Dr. Harper then responded. In his response he falsely stated that Dr. Adelstein's certificate of insurance was expiring on October 31, 2021 (it was not); that PeaceHealth had notified Dr. Adelstein's locums company that Dr. Adelstein would not be needed in the future (it had not); and began the process for a voluntary resignation of privileges (in which the person supposedly voluntarily relinquishing his privileges had not asked to do so, and had not even been notified that the voluntary relinquishment was in fact occurring.

146.    On December 2, Ms. Lemonds notified Dr. Adelstein that his privileges at SJMC would remain active, but provided no explanation for why this decision had been reversed.

147.    On November 21, 2021, Dr. Adelstein emailed PeaceHealth System Director of Privacy and Integrity Tarra Carey about PeaceHealth's continued refusal to investigate his complaints. In the email, Dr. Adelstein notified Ms. Carey about conduct by Dr. Shoemaker and Dr. Axelrod "that are dangerous to both patients and staff." Dr. Adelstein elaborated that Ms. Brunelle "witnessed the retaliation I endured the last time I tried to come forward, and I believe she may have more evidence" of the misconduct at issue.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

148.    The following morning Ms. Carey notified Dr. Adelstein that she wanted to meet separately with him and Ms. Brunelle as she "begin[s] this investigation." In the afternoon of November 21, Dr. Adelstein and Ms. Brunelle reported to Ms. Carey the misconduct and retaliation to which they had been subjected in two separate conversations. During those conversations Ms. Carey validated that the conduct they described regarding Dr. Shoemaker's billing practices. Ms. Carey stated that it sounded like Dr. Shoemaker was engaging in unlawful upcoding. She told Ms. Brunelle that even if a small portion of what Ms. Brunelle had shared was true, PeaceHealth has some large problems.

149.    On December 2, Ms. Carey wrote to Dr. Adelstein, informing him that PeaceHealth had retained an outside attorney, Joy Ellis, to investigate his concerns. Then on December 8, she wrote again to inform him that Ms. Ellis had a conflict and instead his complaints would be investigated by Seattle attorney Stephanie Bernsten.

150.    Ms. Bernstein never contacted Dr. Adelstein.

151.    On January 12, 2022, Dr. Harper emailed Dr. Adelstein "to clarify that Ms. Berntsen has not been retained to investigate the matters you raised. PeaceHealth communicated to you about the termination of your locums contract, which was terminated consistent with the termination provisions of your contract. PeaceHealth has complied with its legal and compliance obligations.  While we appreciate the work you have done over the years, we will not be communicating with you further on the matters raised below."

152.    On January 31, 2022, Dr. Adelstein received an email from PeaceHealth Assistant General Counsel Craig Armstrong, in which PeaceHealth announced that its "decision to end its relationship with you is final."

   K.  *Defendants' retaliation against Ms. Brunelle continued apace.*

153.     Throughout the fall of 2021, Ms. Brunelle remained confined to her office and sealed off from colleagues and staff, while Dr. Axelrod was free to dictate the terms of any reckoning for his abuse of Ms. Brunelle. Ms. Brunelle was told by Dr. Harper, Dr. Torres and Ms. Unger that Dr. Axelrod believed that Ms. Brunelle was "targeting" him with "unfettered" attacks on his character. To remediate that problem, she was told that the only path forward was a conversation between Dr. Axelrod and Ms. Brunelle, mediated by Dr. Harper, Dr. Torres or Ms. Unger. However, when Dr. Axelrod was unwilling to participate in such conversation, Ms. Brunelle was forced to continue to shelter in her office.

154.     On October 19, 2021, the patient who had complained about Dr. Shoemaker telling her "I pay for people like you" came into SJMC for an appointment. While receiving an injection, a patient reported symptoms that could have been the result of one of many possible adverse effects of a medication Dr. Shoemaker was prescribing.  Tests to monitor blood levels of this medication and identify any possible adverse effects before they become clinically significant should have been administered every 6–12 months (or more often if clinical suspicion emerged), but Dr. Shoemaker had not ordered a test for almost 5 years.

155.     On October 27, 2021, Ms. Brunelle met again with Ms. Unger. During the meeting, Ms. Brunelle expressed anger about the fact that it had been nearly three months since she had complained about Dr. Axelrod and Dr. Shoemaker and PeaceHealth still had taken no meaningful steps to redress her concerns. Ms. Brunelle further reiterated that it had been more than five weeks since Dr. Axelrod had threatened her and she still remained confined to her office. In response to Ms. Brunelle's complaints, Ms. Unger provided a series of empty reassurances and excuses.

156.     During the October 27 meeting, Ms. Unger reiterated Dr. Axelrod's threat to sue Ms. Brunelle for "slander." Ms. Brunelle responded by asking if she

needed to secure legal counsel. Ms. Unger counseled Ms. Brunelle against getting an attorney.

157.    During the October 27 meeting, Ms. Unger told Ms. Brunelle that Dr. Harper and SJMC chief-executive Dr. Scott Foster had made the decision to unilaterally end all contractual relationships with Dr. Adelstein.

158.    During the October 27 meeting Ms. Unger first told Ms. Brunelle that the investigation was complete and that Ms. Unger would be escalating the concerns that Ms. Brunelle had raised. When Ms. Brunelle expressed incredulity that despite the supposed completion of the investigation nothing had changed-- she was still unable to perform her duties outside the physical confines of her office and Dr. Axelrod was still able to continue his retaliation-- Ms. Unger reluctantly agreed that in fact the investigation had not been completed.

159.    The meeting ended with Ms. Unger promising Ms. Brunelle that PeaceHealth would hire an external attorney to conduct an independent investigation of all the concerns that Dr. Adelstein and Ms. Brunelle had attempted to bring forward. She assured Ms. Brunelle that all of her complaints would be put on the table and she would be provided with findings about those complaints. That promise was not kept.

160.    When PeaceHealth made a decision to permanently part ways with Dr. Adelstein, it also apparently resolved not to examine Dr. Adelstein's complaints or how Dr. Adelstein's complaints were consistent with the complaints that Ms. Brunelle raised.

161.    On October 28, Ms. Unger emailed Ms. Brunelle and told her that PeaceHealth attorney Sarah Malik would be reaching out to investigate Ms. Brunelle's complaints.

162.    On November 5, Ms. Brunelle met with Ms. Malik in a recorded video conference. During that recorded meeting Ms. Malik acknowledged that Ms.

Brunelle had been retaliated against by Dr. Axelrod and PeaceHealth. She further promised that she would be conducting a detailed investigation into the matter, and that that investigation would include speaking to Dr. Adelstein among others.

163.   Ms. Brunelle told Ms. Malik that she was feeling that if PeaceHealth did not begin to move forward to address her complaints she would have no choice but to resign from employment. She stated:

> I think I need to be honest with you Sarah, like if nothing changes, I can't keep working like this. I feel like PeaceHealth has completely let me down. They allowed [Dr. Axelrod], I mean, they haven't investigated what he's done, they only investigated the [September 17] email, nobody has changed the reporting structure, nobody stepped in to help the relationship get rebuilt, nobody's protecting our patients, I'm locked away in my office by myself.
>
> If this doesn't take me somewhere, I don't really have any option but to go to an attorney because this is all wrong. I did all this to protect the patients and the staff against things that are happening that are illegal to our patients; they are unethical; they are potential lawsuits, most of these complaints. [Dr. Shoemaker] is talking to people about their sexual status; he's talking to them about religion; he's missing lab work. I mean, it's crazy. And I'm in this, being, you know, threatened by a guy that ranks above me in the organization, and isolated in my office unable to do my job.

164.   Ms. Malik responded that what Ms. Brunelle was experiencing was "unacceptable." She elaborated, "I promise that I will do my best to give this as much attention that it hasn't received before."

165.   For more than a month, despite sending multiple emails to Ms. Malik, Ms. Unger and others asking for an update, Ms. Brunelle heard nothing back.

166.   During that period of ongoing silence from PeaceHealth regarding her complaints, Ms. Brunelle continued to receive and forward complaints about Dr. Shoemaker's behavior. On November 9, Ms. Brunelle wrote to Dr. Harper

describing Dr. Shoemaker's botched testimony in a court matter, and other failings including derailing a staffing with an irrelevant and off-color anecdote about television host Mike Rowe castrating animals, and a failure to see a patient for at least two days. Dr. Harper responded nearly a month later, asking for the medical record number on one of the patients. On information and belief, no substantive action was taken.

167.    During that period Dr. Axelrod continued to retaliate against Ms. Brunelle. On December 2, Dr. Axelrod removed Ms. Brunelle from a Microsoft Teams Meetings relating to Admission Policies. On December 7, Ms. Brunelle learned that Dr. Axelrod had rescheduled at least four important meetings and had taken Ms. Brunelle off the invitation.

168.    On or about December 8, Ms. Brunelle informed Ms. Glaser of Dr. Axelrod's removal of Ms. Brunelle from meetings she needed to attend as part of her job. Ms. Glaser responded that it appeared that Dr. Axelrod was still retaliating against Ms. Brunelle.

169.    In December 2021, the attorney retained by PeaceHealth, Stephanie Bernsten, met with Ms. Brunelle. During the conversation, Ms. Bernsten stated that she had been hired to investigate all of Ms. Brunelle's complaints.  During that December 15 meeting and a subsequent December 17, 2021 meeting, Ms. Brunelle provided Ms. Bernsten information about the complaints Ms. Brunelle had raised and the retaliation she had suffered as a result of bringing those complaints forward.

170.    On January 22, 2022, Ms. Brunelle met with Ms. Bernsten a third time. During that third conversation Ms. Bernsten asked Ms. Brunelle if she thought that there were additional witnesses that Ms. Bernsten needed to speak with. Ms. Brunelle stated that Ms. Bernsten should speak to Dr. Adelstein who had gone through the same experience of complaining about Dr. Shoemaker and then being pushed out of the organization by Dr. Axelrod. Ms. Bernsten stated that she could

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

not include Dr. Adelstein because PeaceHealth had instructed her only to investigate whether or not Ms. Brunelle had experienced retaliation.

171.    Ms. Brunelle responded that PeaceHealth System Director Tarra Carey had told Dr. Adelstein and Ms. Brunelle that Ms. Bernsten would be investigating Dr. Adelstein's concerns as well and that she would reach out to Dr. Adelstein. Ms. Bernsten responded, "I don't know what to say."

172.    On January 4, Ms. Brunelle sought medical care for the extreme stress that she has experienced from PeaceHealth's failure to prevent or address the retaliation that she had experienced, and the psychological injuries stemming from her period of forced professional isolation and inability to perform her job duties.

173.    On February 1, HR employee Blake Hausmann called Ms. Brunelle to inform her that he wished to set up a meeting with Ms. Brunelle but had no answers as to the outcome of the investigation. More than three months after Ms. Unger's promise to get all of Ms. Brunelle's concerns on the table and provide her with concrete findings, PeaceHealth continued to refuse to provide her with any information.

174.    In March 2022, Ms. Brunelle's medical leave was scheduled to end. As PeaceHealth had taken no meaningful steps to make the workplace safe for Ms. Brunelle, and free from Dr. Axelrod's ongoing retaliatory behavior, Ms. Brunelle's anxiety remained unabated. Upon consultation with her medical provider, Ms. Brunelle sought and received additional leave.

175.    By April 2022, it became clear to Ms. Brunelle that PeaceHealth would not take steps to address her complaints, or remediate the conditions that had made the work environment intolerable. In April Mr. Hausmann wrote to Ms. Brunelle stating that PeaceHealth wanted to engage a facilitator to work to "reestablish a collegial working relationship." However, Mr. Hausmann made clear that there

would be no opportunity to "reinvestigate or continue to revisit disagreements or patient clinical information connected to past events at a detailed level."

176.    In other words, PeaceHealth expected Ms. Brunelle to return to her position without any resolution to the complaints that she and Dr. Adelstein brought forward. Those were to be simply brushed aside.

177.    On April 13, 2022, Ms. Brunelle tendered her resignation due to the intolerable work conditions PeaceHealth created and maintained. She wrote to her supervisor, Mr. Rahn, stating that "the conditions of my job have become so unbearable that I am unable to return to work and execute my job duties." She further explained:

> Over the past several months I have utilized all the proper resource channels to attempt to resolve the issues brought forth in the letter sent to PeaceHealth on March 28, 2022. During that time, PeaceHealth continuously told me that bringing my concerns forward was what was expected of me, promised me that they would work to resolve them and apologized for the treatment I experienced. However, there has been no real attempt at resolution or any measurable change.

> The trust between me and Dr. Axelrod is shattered. From the beginning I have been willing to come to the table to work with Rob on repairing our relationship, but have only been met with abuse, avoidance, and further damage to the relationships I have worked hard throughout my entire career to build. After six months of promises to have a meeting with Dr. Axelrod, PeaceHealth has finally offered to schedule it, but has changed the promised purpose of the meeting and added rules to prevent me from discussing the past wrongs I have experienced. Our trust cannot be repaired without being able to openly discuss the ongoing damage Rob has done to my reputation and the retaliation I have suffered. In fact, the invitation takes the retaliation one step further by implying that my lack of leadership skills is what contributed to the situation. My leadership and standing up for the rights of our patients and staff should have been the solution to these issues, not the problem.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

I am extremely disappointed in the lack of responsibility shown by all levels of management throughout this time and the lack of action on my behalf. After multiple PeaceHealth leaders have acknowledged the same, they have continued to allow the retaliation, abuse and irreparable damage to my reputation.

I loved my job for 23 years and had planned to finish my career at PeaceHealth. Yet despite a lifetime of dedication to PeaceHealth, the environment has become so dysfunctional and my working conditions so intolerable that my current position is no longer tenable, leaving me no option but to resign in response.

You should be aware that I am resigning in response to an irrevocable breakdown of the employment relationship by PeaceHealth and I therefore consider myself constructively discharged, effective immediately.

> L.   *Defendants attempted to interfere with a Washington Medical Commission investigation into Dr. Shoemaker's conduct.*

178.    In or around March, 2022, the Washington Medical Commission ("WMC") informed PeaceHealth that it was conducting an investigation into complaints about Dr. Shoemaker. Those complaints involved many of the same concerns described in this complaint. As part of its investigation, the WMC reached out to individuals who had worked with Dr. Shoemaker and may have witnessed inappropriate conduct by Dr. Shoemaker. The WMC also asked the hospital whom at PeaceHealth would have relevant information.

179.    In that notice that it sent out, the WMC instructed, "Due to the confidential nature of this investigation it is requested that you not discuss the contents of this letter, or your responses with any other individuals."

180.    Notwithstanding that instruction from the WMC, Mr. Huhta and PeaceHealth contacted witnesses WMC identified and asked them to provide their statements not to the WMC directly, but instead to PeaceHealth. Mr. Huhta wrote,

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

"Once you have drafted your statement, you can send it to me or [PeaceHealth's attorney on the matter], and we can forward onto the Commission on your behalf."

181.    Further, in contravention of WMC's instructions not to discuss the matter with any other individuals, Mr. Huhta wrote to witnesses, "if you decide to send your response directly to the Commission, please let us know so that we know you have responded."

182.    Upon information and belief, Mr. Huhta and PeaceHealth attempted to undermine the efficacy of the WMC investigation into Dr. Shoemaker by, among other things, referring the WMC to individuals who  were unlikely to know or provide accurate information about Dr. Shoemaker's unprofessional conduct.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## WHISTLEBLOWER RETALIATION UNDER THE FALSE CLAIMS ACT

### (31 U.S.C. § 3730(h))

*By Both Plaintiffs against all Defendants*

183.    Plaintiffs reallege and incorporate each paragraph above as though fully set forth herein.

184.    Dr. Adelstein and Ms. Brunelle both reported concerns about Dr. Shoemaker submitting a medical charge for an event in which he had not provided services to that patient. On multiple occasions Plaintiffs asked Defendants to examine Dr. Shoemaker's billing practices in order to determine if PeaceHealth and/or Dr. Shoemaker had submitted false charges to third parties including the Centers for Medicare & Medicaid Services.

185.    By reporting their concerns and requesting investigations, Plaintiffsundertook efforts to stop one or more violations of the False Claims Act.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

186.    Defendants knew that Plaintiffs had reported concerns of improper billing by Dr. Shoemaker, including potential improper billing to federal government entities, such as the Centers for Medicare & Medicaid Services.

187.    Defendants retaliated against Plaintiffs for making those reports.

188.    Defendants retaliated against Dr. Adelstein by, among other things, terminating his locums contract and canceling scheduled work shifts.

189.    Defendant Dr. Axelrod retaliated against Ms. Brunelle for making those reports by, among other things, threatening her with legal action, preventing her from effectively performing her job duties, and refusing to meet with her.

190.    Defendants further retaliated against Ms. Brunelle by changing the terms and conditions of employment through the creation of a work environment that was personally intolerable to Ms. Brunelle, and would also be intolerable to any reasonable whistleblower in Ms. Brunelle's situation.

191.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer economic damages in the form of lost compensation, and non-economic damages in the form of terror, anxiety, humiliation, and a loss of enjoyment of life. Plaintiffs are entitled to recover double general damages on their economic losses, and special damages for their non-economic losses.

192.    Plaintiffs have been required to retain counsel to pursue this matter. Plaintiffs are entitled to recover their reasonable attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

## WHISTLEBLOWER RETALIATION

### (R.C.W. § 49.60.210)

*By Both Plaintiffs against all Defendants*

193.    Plaintiffs reallege and incorporate each paragraph above as though fully set forth herein.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

194.    Dr. Adelstein and Ms. Brunelle both opposed unlawful practices by Defendants. Among other things Plaintiffs had reported improper quality of care by Dr. Shoemaker, had complained of retaliation by Defendants because Plaintiffs had reported to Defendants concerns of improper quality of care, unprofessional conduct, and unlawful conduct including unlawful billing practices by Dr. Shoemaker.

195.    Defendants retaliated against Plaintiffs for making those reports.

196.    Defendants retaliated against Dr. Adelstein by, among other things, terminating his locums contract and canceling scheduled work shifts.

197.    Defendant Axelrod retaliated against Ms. Brunelle for making those reports by, among other things, threatening her with legal action, preventing her from effectively performing her job duties, and refusing to meet with her.

198.    Defendants further retaliated against Ms. Brunelle by changing the terms and conditions of employment through the creation of a work environment that was personally intolerable to Ms. Brunelle, and would also be intolerable to any reasonable whistleblower in Ms. Brunelle's situation.

199.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer economic damages in the form of lost compensation, and non-economic damages in the form of terror, anxiety, humiliation, and a loss of enjoyment of life. Plaintiffs are entitled to recover general damages on their economic losses, and special damages for their non-economic losses.

200.    Defendants' wrongful conduct is intentional or taken in reckless disregard for Plaintiffs' rights. Punitive damages in an amount to be determined by the jury should be awarded to punish Defendants and deter them from acting in a similar manner in the future.

201.    Plaintiffs have been required to retain counsel to pursue this matter. Plaintiffs are entitled to recover their reasonable attorneys' fees and costs.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

## THIRD CLAIM FOR RELIEF

## BREACH OF CONTRACT

*Count 1. By Plaintiff Dr. Adelstein against Defendants PeaceHealth and SJMC*

202.    Plaintiff Dr. Adelstein realleges and incorporates each paragraph above as though fully set forth herein.

203.    Dr. Adelstein provided medical services to patients of Defendants PeaceHealth and SJMC in exchange for compensation that was paid through a third-party locums provider.

204.    Defendants PeaceHealth and SJMC subjected Dr. Adelstein to a code of conduct, policies, written and unwritten practices and procedures that constituted contractual rights and obligations respecting Dr. Adelstein's provision of medical services to patients of Defendants PeaceHealth and SJMC.

205.    Under those contractual obligations, Dr. Adelstein was required to report to Defendants any inappropriate or unprofessional activity he observed or was subjected to.

206.    Under those same contractual obligations, Defendants PeaceHealth and SJMC promised Dr. Adelstein to maintain a workplace free of retaliation and not to retaliate against Dr. Adelstein for making reports of inappropriate or unprofessional activity.

207.    Dr. Adelstein performed his contractual obligations by among other things, providing proper care to patients of Defendants PeaceHealth and SJMC and by reporting inappropriate behavior by Dr. Shoemaker and Dr. Axelrod.

208.    Defendants PeaceHealth and SJMC breached their contractual obligations, including but not limited to their obligation to follow their own policies and procedures including their policies not to retaliate against individuals for reporting inappropriate or unprofessional behavior.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

209.    Had Defendants abided by their promises Dr. Adelstein would not have had his contract terminated or scheduled shifts canceled. Further Dr. Adelstein would have continued to provide care to patients of PeaceHealth and SJMC.

210.    The termination of Dr. Adelstein's contract violated the implied covenant of good faith and fair dealing in that the termination failed to meet the objectively reasonable expectations of Dr. Adelstein to continued locums employment.

211.    The termination of Dr. Adelstein's locums contract also violated the implied covenant of good faith and fair dealing in that the termination failed to meet the objectively reasonable expectations of Dr. Adelstein to lawful treatment.

212.    Dr. Adelstein is entitled to recover economic damages in an amount to be determined at trial for past and future lost compensation.


**Count 2.** *By Plaintiff Ms. Brunelle against Defendants PeaceHealth and SJMC*

213.    Plaintiff Ms. Brunelle realleges and incorporates each paragraph above as though fully set forth herein.

214.    Defendants PeaceHealth and SJMC subjected Ms. Brunelle to a code of conduct, policies, written and unwritten practices and procedures that constituted contractual rights and obligations respecting Ms. Brunelle's employment by PeaceHealth and SJMC.

215.    Under those contractual obligations, Ms. Brunelle was required to report to Defendants any inappropriate or unprofessional activity she observed or was subjected to.

216.    Under those same contractual obligations, Defendants PeaceHealth and SJMC promised Ms. Brunelle to maintain a workplace free of retaliation and not to retaliate against Ms. Brunelle for making reports of inappropriate or unprofessional activity.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

217.    Among the contractual obligations PeaceHealth and SJMC owed to Ms. Brunelle was the obligation to follow its own procedures and policies.

218.    Defendants PeaceHealth and SJMC breached their contractual obligations, including but not limited to their obligation to follow their own policies and procedures including their policies not to retaliate against individuals for reporting inappropriate or unprofessional behavior.

219.    Had Defendants abided by their promises Ms. Brunelle would not have been forced to resign from employment and in fact would continue to be employed by PeaceHealth and SJMC.

220.    PeaceHealth's and SJMC's failures to follow their own policies  violated the implied covenant of good faith and fair dealing in that they failed to meet the objectively reasonable expectations of Ms. Brunelle to lawful treatment.

221.    Ms. Brunelle is entitled to recover economic damages in an amount to be determined at trial for past and future lost compensation and benefits.

## FOURTH CLAIM FOR RELIEF

## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

### *By Both Plaintiffs against All Defendants*

222.    Plaintiffs reallege and incorporate each paragraph above as though fully set forth herein.

223.    The State of Washington has a public policy in favor of reporting medical quality of care concerns. The State of Washington also has a public policy in favor of preventing unprofessional conduct as defined by R.C.W. § 18.130.180 by medical license holders including medical doctors.

224.    Defendants PeaceHealth and SJMC  terminated Dr. Adelstein's locums contract without justification and in retaliation for his reporting quality of care concerns and unprofessional conduct, and by opposing unlawful practices by Dr. Shoemaker.

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

225.    Defendant Dr. Axelrod aided, abetted, encouraged or incited the PeaceHealth's and SJMC's wrongful termination of Dr. Adelstein's locums contract and therefore is individually liable for Dr. Adelstein's damages as a result of his conduct.

226.    Ms. Brunelle reported quality of care concerns and opposed unlawful practices by Dr. Shoemaker.

227.    Defendants retaliated against Ms. Brunelle by, among other things, interfering with her normal work movement, excluding her from work-related meetings or conversation, and refusing to take remedial measures to her complaints. Defendants' retaliatory conduct changed the terms and conditions of Ms. Brunelle's employment to the point that her position was intolerable.  Moreover, Defendants' retaliatory behavior towards Ms. Brunelle would make her working condition intolerable to a reasonable person in Ms. Brunelle's position.

228.    Defendant Dr. Axelrod aided, abetted, encouraged or incited the PeaceHealth's and SJMC's retaliatory conduct towards Ms. Brunelle and therefore is individually liable for Ms. Brunelle's damages as a result of his conduct.

229.    As a result of the unlawful actions alleged herein, Dr. Adelstein and Ms. Brunelle suffer and continue to suffer emotional injury and loss of enjoyment of life. They are entitled to noneconomic damages sufficient to compensate them for their noneconomic injuries in such amount as may be found appropriate by a jury based on the evidence presented at trial.

230.    As a result of the unlawful actions alleged herein, Plaintiffs also suffered economic damages. They are entitled to recover their past and future lost wages and other compensation, past and future lost earning capacity, and other economic damages incurred in connection with the injuries caused by the actions alleged herein in such amount as may be awarded by a jury based on the evidence presented at trial.

231.    Defendants' wrongful conduct is intentional or taken in reckless disregard for Plaintiffs' rights. Punitive damages in an amount to be determined by

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

the jury should be awarded to punish Defendants and deter them from acting in a similar manner in the future.

**FIFTH CLAIM FOR RELIEF**

**AIDING UNFAIR PRACTICES**

**(R.C.W. § 49.60.220)**

*By Both Plaintiffs against Defendant Dr. Axelrod*

232.    Plaintiffs reallege and incorporate each paragraph above as though fully set forth herein.

233.    Dr. Adelstein and Ms. Brunelle engaged in legally protected conduct by, among other things, reporting quality of care concerns, and concerns about Dr. Shoemaker submitting a medical charge for an event in which he had not provided services to that patient.

234.    Defendant Dr. Axelrod aided, abetted, encouraged or incited the PeaceHealth's and SJMC's wrongful termination of Dr. Adelstein's locums contract and retaliatory conduct towards Ms. Brunelle.

235.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and continue to suffer economic damages in the form of lost compensation, and non-economic damages in the form of terror, anxiety, humiliation, and a loss of enjoyment of life. Dr. Axelrod is individually responsible for general damages on their economic losses, and special damages for their non-economic losses.

236.    Plaintiffs have been required to retain counsel to pursue this matter. Plaintiffs are entitled to recover their reasonable attorneys' fees and costs.

**V.      JURY TRIAL DEMAND**

237.    Plaintiffs demand a jury trial on all claims and issues triable to a jury.

**VI.      PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

a.   Assume jurisdiction over each of the claims set forth herein;

b.   Issue a declaration that each Defendant has violated Plaintiffs' legally protected rights, and an order requiring Defendants to correct these deficiencies;

c.   Grant equitable relief including but not limited to an expungement of all negative references or allegations of performance deficiencies that may be in Plaintiff Ms. Brunelle's personnel file;

d.   Order Defendants to make Plaintiffs whole by compensating Plaintiffs for past and future pecuniary losses, including expenses, impairment of earning capacity, lost past and future earning and benefits of employment, and such other losses as are awarded by a jury or otherwise established at trial;

e.   Order Defendants to pay double general damages for Plaintiffs' economic losses;

f.   Order Defendants to pay Plaintiffs an award of compensatory damages for non-economic losses, including physical and emotional injury, pain and suffering, mental anguish, terror, embarrassment, and loss of enjoyment of life in an amount to be determined by a jury;

g.   Order Defendants to pay punitive damages in an amount to be determined by the jury sufficient to punish Defendants and deter them from acting in a similar manner in the future.

h.   Award Plaintiffs their costs of suit and reasonable attorney fees, costs, and expert witness fees;

i.   Order Defendants to compensate Plaintiffs for any tax penalty associated with recovery;

j.   Order Defendants to pay prejudgment and post-judgment interest, as appropriate, on all amounts due to Plaintiffs as a result of this action;

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078

k.  Grant a permanent injunction enjoining Defendants, its officers, management personnel, employees, agents, successors, and assigns, and all persons in active concert or participation with Defendants, from engaging in any employment practice which discriminates against employees because of any whistleblower activities;

l.  Order Defendants to create, implement, and carry out policies, practices, and programs providing for equal employment opportunities which affirmatively eradicate the effects of past and present unlawful employment practices, on such terms as the court may direct; and

m.  Any other relief the Court deems just and equitable.

DATED: July 11, 2022                    KLEIN MUNSINGER LLC

By:  *s/ Jose Klein*
     Jose Klein, WSB No. 47449
     jose@kleinmunsinger.com
     Attorneys for Plaintiff

KLEIN MUNSINGER LLC
1215 SE 8th Ave Ste F Portland OR 97214
503.568.1078