1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JESSICA BRUNELLE, an individual; and
JONATHAN ADELSTEIN, an individual,
Plaintiff,

v.

PEACEHEALTH, a Washington nonprofit
corporation; and ROBERT AXELROD, an
individual,
Defendant.

CASE NO. 3:22-cv-05499-TMC

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

This matter comes before the Court on Defendants PeaceHealth and Robert Axelrod's

Motions for Summary Judgment. Dkt. 64; Dkt. 65. Plaintiffs Jessica Brunelle and Jonathan

Adelstein allege four claims against their former employer: retaliation in violation of the False

Claims Act (FCA); retaliation in violation of the Washington Law Against Discrimination

(WLAD); aiding unfair practices in violation of the WLAD (alleged against Axelrod only); and

wrongful discharge under Washington common law. Plaintiffs argue that Defendants retaliated

against them for reporting about possible fraudulent billing and discriminatory comments.

Brunelle claims she was forced to resign, while Adelstein maintains that he was "blackballed"

from contract work with the entire organization. In turn, PeaceHealth and Axelrod argue that

Plaintiffs failed to engage in activity protected by the FCA and WLAD and that, even had they done so, Plaintiffs never experienced any retaliation as a result.

The court has considered the pleadings filed in support of and in opposition to the motion and the file herein. For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendants' motion.

## I.   RELEVANT FACTS

PeaceHealth is a multi-state health system. Dkt. 61-1. The company operates Saint Joseph's Medical Center (SJMC) in Longview, Washington. Dkt. 65 at 4. PeaceHealth maintains both an outpatient behavioral health clinic and an inpatient psychiatric unit at SJMC. *Id.* PeaceHealth employs a mix of medical providers (doctors, nurses, and others) and non-medical staff to manage the facility and serve patients' needs. *See* Dkt. 1 ¶ 7–8; Dkt. 61-1.

Plaintiff Jessica Brunelle worked as administrative staff for PeaceHealth for 24 years. Dkt. 70 ¶ 4; Dkt. 65 at 5. Throughout her time with PeaceHealth, Brunelle had an excellent record of employment. Dkt. 1 ¶¶ 19–22; Dkt. 65 at 21. In 2018, she was promoted to be the Manager of Behavioral Health at SJMC. Dkt. 70 ¶ 10. In this role, she managed various aspects of the facility's inpatient and outpatient behavioral health services. *Id.* ¶ 11. She was responsible for personnel, including recruitment, development, evaluation, and clinical supervision. *Id.* She helped investigate and resolve patient complaints before escalating them, if necessary, to others within the hospital system. *Id.* ¶ 12.

Brunelle's job required her to support *locums tenens* providers at SJMC. *See id.* ¶ 11–12. To manage staffing needs, PeaceHealth would work with medical staffing agencies to employ temporary physicians and nurse practitioners, known as *locums tenens* ("*locums*"). Dkt. 65 at 4; Dkt. 60 ¶ 3. Dr. Jonathan Adelstein was a *locums* provider at SJMC. Dkt. 71 ¶ 5. Adelstein began working at SJMC in 2016. *Id.* ¶ 5.

1

2

3

4

Over time, Brunelle was "regularly approached" by providers and support staff with concerns about a permanent provider at SJMC, Dr. Jerad Shoemaker. Dkt. 70 ¶ 15; *see generally* Dkt. 70-4. Shoemaker is a psychiatrist at SJMC. Dkt. 65 at 6. At the time, Shoemaker was the Section Lead and the Medical Director for Behavioral Health at SJMC. *Id.*

5

6

7

8

9

10

11

12

13

14

15

16

In late 2020, Brunelle began raising these staff concerns with leadership. Dkt. 70 ¶ 15. Leadership included Defendant Dr. Robert Axelrod. *Id.* ¶¶ 17–18. Axelrod was the System Medical Director for the Behavioral Health Department at SJMC. Dkt. 65 at 6. Brunelle also reported her concerns to Kyle Rahn, then-Administrative Director of Behavioral Health Services and Brunelle's manager. Dkt. 70 ¶¶ 17–18; Dkt. 1 ¶ 19. On August 19, 2020, Brunelle met with Axelrod and Rahn to discuss the growing concerns. Dkt. 70 ¶ 18. Axelrod suggested that Brunelle put together a list of the complaints, which he could then send to leadership. *Id.* ¶¶ 18–20. Brunelle did so, and Axelrod forwarded the email to Senior Human Resources Partner Malisa Glaser and Division Chief Dr. Simon Lai. *Id.* ¶ 22. The list detailed various professional and clinical concerns. *See* Dkt. 70-4 at 1–2. Shoemaker failed to arrive at his start time on the unit; regularly missed meetings; ridiculed the hospital's pandemic policies; and offended both staff and patients, such as by telling a patient he was "flamboyant." *Id.*

17

18

19

20

21

22

In response, Lai began meeting regularly with Shoemaker to address the concerns. Dkt. 70 ¶ 23. Brunelle would deliver staff concerns to Lai and then Lai would review the issues with Shoemaker. *Id.* In January 2021, during a meeting between Brunelle and Shoemaker about call schedules, Brunelle alleges Shoemaker told her he knew about her reporting and made "several snide remarks to me about knowing that I had 'tattled' on him." Dkt. 70 ¶ 34. Regular work meetings became increasingly more "contentious." *Id.*

23

24

In February 2021, Adelstein began bringing concerns about Shoemaker to Brunelle. Dkt. 70 ¶ 37. That month, Adelstein worked in the outpatient care clinic at SJMC for the first time. *Id.*

¶ 36. While there, he "developed serious concerns about the care Dr. Shoemaker had been providing to patients of the outpatient clinic." *Id.* ¶ 37; *see* Dkt. 70-6 at 1-2. One patient told Adelstein that Shoemaker informed the patient that he was not a real veteran because he had not experienced combat. Dkt. 71 ¶ 20–21. Another expressed that Shoemaker had spoken to them about religion in a manner that made them feel uncomfortable. *Id.*  Others described decisions made about their prescribed medications that seemed to be, or were, made without necessary information. *Id.* Another patient told Adelstein that Shoemaker changed her medications without her informed consent. *Id.* Many expressed that they had seen Shoemaker multiple times and he did not remember them. *Id.*

Adelstein decided to review Shoemaker's notes for these and other patients. Dkt. 71 ¶ 22. Shoemaker's "clinical reasoning and decision-making" worried Adelstein. *Id.* The "notes were vague, provided limited relevant information and oftentimes did not tend to support the medication decisions that Dr. Shoemaker had made." *Id.*

On February 15, 2021, Adelstein wrote to Axelrod explaining his concerns about Shoemaker's work. Dkt. 70-6 at 2. He included Brunelle on the email. *Id.* at 1–2. Axelrod forwarded the email to Lai and Brunelle expressing concerns about "broad, unsubstantiated allegations of incompetent medical care." *Id.* at 1. Brunelle responded affirming Axelrod's worries. *Id.* Brunelle explained, "as frustrated as I am with Jerad, I want this to be a fair process about real issues and not anyone's witch hunt." *Id.*

Separately, Brunelle spoke with Adelstein. She told him that he needed to reach out to Axelrod with more substantive concerns. Dkt. 70 ¶ 40; Dkt. 71-2 at 1. Adelstein failed to ever provide specifics, though in a follow up email, he noted "the pattern over the years is more than the sum of its parts. We should absolutely speak more, perhaps offline." Dkt. 70 ¶ 41.

Amid the growing concerns, staff—including Rahn, Brunelle, Lai, and Axelrod—decided it was best for Shoemaker to step down from his leadership role. Dkt. 70-7 at 1–3. Axelrod took over as Interim Medical Director and Section Lead, becoming Shoemaker's supervisor as a result. Dkt. 70 ¶¶ 42, 44, 48; Dkt. 70-7 at 1–3. As complaints continued, Lai and others decided to put Shoemaker on a performance improvement plan (PIP). Dkt. 70 ¶ 47; Dkt. 70-7 at 2. According to Brunelle, Axelrod "publicly voiced his opposition" to the PIP. Dkt. 70 ¶ 47–48; *see also* Dkt. 70-26 at 2; Dkt. 70-36 at 6–7.

On May 24, 2021, Shoemaker failed to see a patient assigned to him. Dkt. 70 ¶ 55. Brunelle had heard reports of Shoemaker missing patients on two other occasions. *Id.* ¶¶ 55–56. This time, "[b]ecause [] Shoemaker was working alongside his supervisor, [] Axelrod, if it had been discovered that a patient was missed, it would have been difficult for [] Shoemaker to place responsibility for the missed patient on another provider." *Id.* ¶ 58. Axelrod instructed Shoemaker to file an internal "Safe2Share" report about the incident. *Id.* ¶ 59; Dkt. 70-13.

Brunelle reviewed the report on May 27, 2021. Dkt. 70. ¶ 60. She thought Shoemaker's notes were written "in a way that would not lead a reviewer of the note to understand that the patient had not been seen by a provider." *Id.* Brunelle was concerned a charge had been submitted for a service not actually provided. *Id.* Brunelle investigated and confirmed a charge had in fact been filed. *Id.*; Dkt. 70-16 at 2. Brunelle notified Rahn and worked with the billing department to have the charge reversed. Dkt. 70 ¶ 60; Dkt. 70-15. She raised an alarm that the charge could have resulted in fraudulent billing. Dkt. 70-15.

Brunelle remained concerned about the billing issue and began reviewing relevant PeaceHealth and federal agency trainings about billing fraud. Dkt. 70 ¶ 64; Dkt. 70-18 at 1. She concluded that she was legally obligated to report the charge, even once rectified, to

PeaceHealth's Office of Organizational Integrity (OI). Dkt. 70 ¶ 64; Dkt. 80-6. The next day she told Axelrod, Rahn, and Glaser that she had filed an OI complaint. Dkt. 70 ¶ 66; Dkt. 70-21 at 1.

On June 8, Brunelle met with OI staff, as well as Axelrod, Rahn, and Glaser. Dkt. 70 ¶ 68. She "vocalized that PeaceHealth's refusal to take steps to hold Dr. Shoemaker accountable for conduct that appeared to me to be illegal . . . affected my ability to hold accountable staff who reported to me and also presented significant risks to PeaceHealth and to patients." *Id.*; *see also* Dkt. 70-21 at 1 (reminding Glaser that she expressed concerns in the meeting about accountability for Shoemaker). Brunelle "began to fear that [she] would be subject to retaliation for refusing to ignore these problems." Dkt. 70 ¶ 68.

Axelrod met with Shoemaker alone to discuss the complaints. Dkt. 70-19 at 2. He emailed OI, Rahn, Glaser, and Brunelle, to tell them that Dr. Shoemaker "understands (now) he cannot drop a charge without personally doing a F2F evaluation," while acknowledging that his decision to charge was "not accidental." Dkt. 70-19 at 1. He noted that Shoemaker claimed he had not ever dropped a charge without a face-to-face evaluation before. *Id.* Axelrod failed to ask why Shoemaker had let it appear that he had seen the patient. *Id.*

Meanwhile, Adelstein also heard about the charge. Adelstein worked the inpatient unit alongside Shoemaker the week of June 21. Dkt. 71 ¶ 39. While they were working, Shoemaker mentioned that he was "in trouble" for submitting a bill for a patient he didn't see. *Id.* Learning that Shoemaker had billed for a patient he had never seen made Adelstein "think about his behavior . . . in a new light." Dkt. 71 ¶ 40. Adelstein decided to submit an anonymous concern in PeaceHealth's OI portal. Dkt. 71 ¶ 41; Dkt. 63-12. Though OI followed up requesting more information, Adelstein failed to respond. Dkt. 65 at 9; Dkt. 63-12 at 3–4. Adelstein told Brunelle that he had filed the report but told no one else. Dkt. 65 at 9.

Before Axelrod knew that Adelstein had reported the billing charge to OI, he began altering Adelstein's schedule. *See* Dkt. 70-24 at 2 (email from Axelrod to staffing agency in May about scheduling); Dkt. 70-25 at 1 (email from Axelrod to PeaceHealth employees announcing schedule changes on June 1). As the interim Medical Director, Axelrod was responsible for reviewing scheduling and staffing needs and adjusting SJMC's approach accordingly. Dkt. 65 at 8. Axelrod felt that SJMC needed another full-time provider. *Id.* He hired a nurse practitioner, Jennifer Urune, to fill the role. Dkt. 62 ¶ 4. Though Urune was also a *locums*, she was less expensive for PeaceHealth than Adelstein because she was a nurse practitioner rather than a psychiatrist. Dkt. 62 ¶ 4.

In early June, Axelrod started telling others about these plans. *See* Dkt. 70-25. He told Brunelle that he wanted to move away from scheduling Adelstein's *locums* shifts. Dkt. 70 ¶ 87. This seemed to be an abrupt shift from conversations a few months earlier. In February and March, concerned about a shortage of providers, Axelrod had emphasized the importance of maintaining a good relationship between Adelstein and PeaceHealth. Dkt. 70 ¶ 45; Dkt. 70-8. Axelrod had discussed expanding Adelstein's role, covering needs through October. *See* Dkt. 71-3. In March, Axelrod got approval for Adelstein to cover telehealth shifts as a *locums*. Dkt. 70 ¶ 46; Dkt. 70-8. Axelrod himself said he wanted to "take advantage of Adelstein working solo" as much as possible because of the provider shortages. Dkt. 70-8. Axelrod planned (it seemed) to rely on Adelstein as much as possible through the end of 2021. *Id.* ("We are going to be short coverage end of year, unless someone wants to work an extra weekend. . . the hope would be we could get Adelstein for one."). In March 2021, PeaceHealth and Axelrod tried to convert Adelstein to a permanent position, but negotiations were unsuccessful. Dkt. 70-9 at 2.

In May 2021, Axelrod began speaking with a *locums* staffing company about replacing Adelstein. *See generally* Dkt. 70-24. Axelrod had scheduled Urune for shifts through July 18.

Dkt. 70-24 at 1. Axelrod began confirming Urune's shifts for late summer and fall. *Id.* On June 1, Axelrod forwarded a message to Brunelle, Shoemaker, and others, confirming staffing through June and July. Dkt. 70-25 at 1. He noted, "We obviously have to maintain sensitivity to Dr. Adelstein's commitment to us. Eventually, if Urune is a good fit, we will move toward removing Jon from IP responsibilities." *Id.* On July 9, Axelrod confirmed with Adelstein's staffing company that his August shifts were canceled. Dkt. 70-29 at 2. Previously agreed dates for September and October were canceled as well. *See id.*

On June 15, Axelrod emailed Adelstein to inform him that his shifts would be cut and his time at SJMC would be over. Dkt. 71-5 at 5–6. Axelrod told Adelstein that Urune would be taking Axelrod's shifts but offered him the possibility of working in a different PeaceHealth facility. *Id.* He explained, "I really can't say for sure but believe that would make your week in July with us likely the last IP week we would need you for." *Id.* Axelrod also offered the possibility of working remotely, noting "[t]here is a push to hire a 3rd party televendor but I would prefer to have someone we already know (you) doing the work." *Id.* at 6. Axelrod was clear that they were not attempting to push out Adelstein: "Obviously we also have a vested interested in having you stay within the PH family, in case you ever do decide to join us more permanently, and because you've been a pleasure to work with for all these years!" *Id.* In a follow up, Axelrod expressed interest in having Adelstein work a few shifts in August if possible. *Id.* at 5.

Adelstein was upset about the change in shifts. *Id.* He could not understand why his shifts were being canceled given his history with SJMC and the "growing need" for staff. *Id.* Axelrod responded to these concerns, noting PeaceHealth's efforts to convert Adelstein to permanent staff and expressing hope that they could continue their "positive relationship." *Id.* at 3.

On July 9, Adelstein told Brunelle that Axelrod had formally notified him that his previously scheduled shifts for August were canceled. Dkt. 70 ¶ 100; Dkt. 71 ¶ 47. Adelstein claimed that Axelrod had told him that SJMC did not need Adelstein even on his remaining scheduled shifts, but that the hospital could not cancel these shifts because of the terms of his *locums* contract. Dkt. 71 ¶ 48. Brunelle spoke with Glaser, telling her that she feared Axelrod was "taking steps to protect [] Shoemaker from accountability related to substandard care and likely incidents of billing for patients that Dr. Shoemaker had not assessed." Dkt. 70 ¶ 103. Brunelle told Glaser she feared that the "abrupt[]" cancellation of Adelstein's September and October shifts was Axelrod's form of retaliation for Adelstein's reporting. *Id.* Glaser directed Brunelle to approach PeaceHealth Medical Group Chief Medical Officer Shaun Harper. *Id.*; *see also* Dkt. 66-2 at 3. Brunelle told Glaser she was worried about retaliation too. Dkt. 70 ¶ 103; Dkt. 66-2 at 3 ("I just spent the last 90 minutes sobbing and verbally vomiting all over Malisa . . . She wants me to go to the CMO for PHMG and whistle blow against Jerad, Rob and Kyle. . . . I don't know if I am strong enough to do so. It would get results but I would pay a huge price.").

Adelstein and Brunelle began discussing his upcoming shift on July 12. Dkt. 71 ¶ 50–52; Dkt. 66-2 at 5–9. Adelstein, angry with Axelrod, decided to take only one patient. Dkt. 66-2 at 5, 9. On July 12, Adelstein checked in for his shift and told the day shift nurse he would only see one patient, rather than the eight that were on his schedule for the day. Dkt. 71 ¶ 53. Axelrod, who was on vacation at the time, was contacted, and immediately reached out to discuss. *Id.* ¶ 54–55.

Axelrod called Adelstein, who informed him that, since Axelrod had told him that PeaceHealth did not need him anymore, he would not be working. *Id.* ¶ 55. Axelrod replied that Adelstein was "imagining things." *Id.* As Adelstein explained, "It suddenly occurred to me that [Axelrod] was covering up for [] Shoemaker. . . . I told him that I believed he was covering up

for [] Shoemaker; that [] Shoemaker had been billing for patients he had not seen and that this was Medicaid fraud. I told him that I believed I needed to report it." *Id.* Axelrod replied that Adelstein was blackmailing him. Dkt. 71 ¶ 56; Dkt. 63-22 at 21. Axelrod told Adelstein that he intended to "file a grievance that's going to haunt you for the rest of your life." Dkt. 71 ¶ 56; Dkt. 63-22 at 21. Axelrod demanded to know if Adelstein would see more than one patient. Dkt. 71 ¶ 56; Dkt. 63-22 at 21; Dkt. 70-26 at 4. Adelstein refused to give a straight answer, and Axelrod hung up. Shortly after, Adelstein texted Axelrod and Brunelle notifying them that he would see more patients. Dkt. 71 ¶ 57; Dkt. 71-7 at 1–2.

Axelrod then called Brunelle. Dkt. 70 ¶ 105; Dkt. 70-26 at 1. Axelrod accused Brunelle of teaming up with Adelstein to harass him. Dkt. 70-26 at 1–2. During the call, Brunelle told Axelrod that Adelstein had reported Shoemaker's mischarge. *Id.* Brunelle recalled, "Then I brought up the fact that he accused me of trying to entrap Jerad in front of my boss, OI and HR – Rob's response was that he thought about the word at the time, knowing that it had a strong meaning and decided it was the right word. I tried to explain to him, again, that I never wanted to entrap anyone[.]" *Id.* at 1. Axelrod said he thought staff had "confirmation bias" and "were looking for issues." *Id.* at 2. Axelrod also told Brunelle that he had helped Shoemaker "appeal his PIP as he did not think the complaints were bad enough for him to be on one." Dkt. 70 ¶ 107; Dkt. 70-26 at 2.

The next day, Brunelle told Glaser about the call, including both her own fears and Adelstein's concerns. Dkt. 70 ¶ 109. On July 15, Adelstein spoke with Glaser and Harper, discussing his concerns about Axelrod's behavior. Dkt. 71 ¶ 58-59. He told them that he thought he was being treated differently because of his reporting about Shoemaker. *Id.* ¶ 60.

On July 22, Brunelle met with Glaser and Harper. Dkt. 70 ¶ 111. Brunelle told Harper and Glaser that her concerns with Shoemaker continued. She noted that she did not think the

billing charge was an isolated incident. *Id.* ¶ 112. She followed up shortly after with information and timelines of all the events with Shoemaker. *Id.* ¶ 113. In her message, she expressed ongoing fear of retaliation: "I feel like this is my last ditch effort as if this doesn't go anywhere I don't have any other options of where to turn to for help." Dkt. 70-28 at 1. No one ever responded. *See id.*; Dkt. 70 ¶ 115.

In early August, PeaceHealth began to implement its COVID-19 vaccine requirement for providers. *See* Dkt. 70-29 at 1. On August 4, Program Director Holly Blondino emailed Axelrod, including Rahn and Brunelle, and asked if they could "hold off on cutting ties with Dr. Adelstein" because of "unrest with the new COVID vacc [sic] requirement." *Id.* Axelrod responded: "I have information you do not, Dr. Adelstein will not be working with us again after the nex[t] week." *Id.* Brunelle forwarded the email to Glaser, highlighting that Axelrod claimed Adelstein would not be working for PeaceHealth again. *Id.* This seemed to her an about face from prior messages which had only noted that his shifts at SJMC were cancelled. *Id.* at 1–2.

On August 9, Adelstein worked what would be his last shifts at a PeaceHealth facility. Dkt. 71 ¶ 64; Dkt. 71-8 at 13. Adelstein knew his time at SJMC was ending but had thought opportunities would still be available at other PeaceHealth locations. Dkt. 71-5 at 6 ("That is why I emailed you about your interest in covering ED and Integrated care work. We have expansive needs across WA state but especially in the NWN – Bellingham, the San Juans, and Mt Vernon. If you have an interest in this work I believe we can make something happen pretty seamlessly."). But on August 9, Holly Blondino approached him to tell him that she was sad it was his last week working with PeaceHealth. Dkt 71-8 at 13. On August 11, Adelstein emailed Glaser expressing his belief that he was being "blackballed" from "the entire organization." *Id.* Adelstein told Glaser and others on the email chain that he thought this was because he had reported suspected fraud. *Id.* Adelstein emailed the group throughout August, September, and

October. Dkt. 71 ¶ 67. No one responded. Dkt. 80-18 at 1–12. Harper forwarded the email to others writing, "We need to tell him to go away once and for all." Dkt. 80-18 at 1.

Amid these communications, Adelstein's *locums* replacement, Jennifer Urune, left SJMC. Dkt. 80 at 38. On August 23, Axelrod informed Rahn, Blondino, and Brunelle that Urune would no longer be taking the *locums* shifts for family reasons. Dkt. 70-31 at 1. Axelrod had asked if she could instead work a cadence much like the one that Adelstein had. Even if she could do so, Axelrod told the others, "[t]his still leaves us very short." *Id.*

On November 19, Brunelle forwarded Adelstein an email she had received stating that Adelstein had resigned his staff membership and privileges with SJMC. Dkt. 71-11 at 1; Dkt. 71-12 at 3. Adelstein emailed PeaceHealth confirming that he had not resigned his privileges and wanted to maintain them. Dkt. 80-10. PeaceHealth responded that they had "made the decision to no longer utilize your services. We followed our normal process and notified your locums agency, Todd Dudley of this in late October." Dkt. 71-12 at 10. When Adelstein tried to confirm with his *locums* agency, he found that no such communication had been sent. Dkt. 71-12 at 61; Dkt. 71-13 at 9–10. Adelstein was also told that his certificate of insurance with SJMC was due to expire at the end of October, so they had simply moved forward with resigning his privileges. Dkt. 71-12 at 3. But Adelstein confirmed that this too was untrue: his certificate of insurance was not set to expire until the end of November. Dkt. 71-12 at 7–8.

After several requests, Adelstein was told his medical staff membership and privileges would remain active. *Id.* at 4. Adelstein requested some explanation of the impetus for the email. *See id.* at 2–3. He never received a response. *See id.* On January 30, PeaceHealth told Adelstein that their relationship was over. Dkt. 71 ¶ 81.

During this time, Brunelle kept escalating concerns about Shoemaker. On August 19, Brunelle connected with Behavioral Health System Director Dr. Erica Torres. Torres was Rahn's

supervisor and Axelrod's Dyad Partner. Dkt. 70 ¶ 127–28. Brunelle met with Torres but found it

unproductive. *See* Dkt. 70-33; Dkt. 70-34. Brunelle continued meeting with Rahn and others, but

nothing seemed to change. Dkt. 70 ¶ 132.

On September 13, Axelrod began removing Brunelle from correspondence directly

related to her job duties. Dkt. 70 ¶ 137; Dkt. 70-37 at 1–2. Four days later, Axelrod emailed

Brunelle:

> If you have concerns about my performance, I ask that you document them in
> writing and send them to me directly as the first step toward resolution. If we cannot
> address your concerns in that fashion, then there is an escalation process . . .
> Following this process should lead to a resolution while protecting my employee
> right to privacy. Adherence to this process is what I expect from any employee.
> . . . .
> In order to protect my professional reputation and employee right to privacy, I insist
> that you not discus your concerns with anyone who does not have a 'need to know'
> or is otherwise outside the above process. For example, discussing your concerns
> about my leadership performance with rank and file clinical staff, or parties outside
> of PeaceHealth will be interpreted by me as a violation of my rights. <u>Please be
> aware that I am prepared to hold you and PeaceHealth accountable for any
> unsubstantiated, inflammatory, and defamatory attacks on my integrity or
> performance or disclosure of confidential personnel matters to those without a right
> to that information</u>.

Dkt. 70-38 (emphasis in original). Brunelle subsequently took a week of paid leave. Dkt. 70

¶ 138. PeaceHealth put Axelrod on a PIP. Dkt. 63-26 at 1–2.

Upon returning to office, Brunelle expressed her ongoing fears to Harper, Glaser, and

Torres. Dkt. 70-41 at 1. They decided to set up a meeting focused on repairing the broken

relationship between Brunelle and Axelrod. *Id.* at 2. In the interim, Brunelle alleges that Glaser

told her to ensure the two would not run into each other before the scheduled meeting. Dkt. 70

¶ 144. They agreed that as Brunelle's office was on a different floor, she could stay in her office

when in the building. *Id.*; *see also* Dkt. 70-41 at 4. She would enter through the back doors to

avoid meeting Axelrod. Dkt. 70 ¶ 144; Dkt. 70-41 at 4.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONs FOR SUMMARY
JUDGMENT - 13

Though the meeting was supposed to occur shortly after Brunelle's return, Axelrod declined a meeting invitation. Dkt. 70 ¶ 145; Dkt. 70-44 at 1–2. He continued to refuse invitations to meet in the following days and weeks. Dkt. 70 ¶ 146. Axelrod eventually offered an explanation: "[T]here are many unanswered questions I have about the last three months which I think need investigation and explanation prior to my participation in a meeting directly with Jessica." Dkt. 70-44 at 1.

On October 7, Brunelle met with Harper again. Harper referred Brunelle to Shawna Unger, Systems Vice President for Human Resources at Peace Health. Dkt. 70 ¶ 154. Brunelle pleaded with Unger and others to set up a meeting with Axelrod:

> I am happy to meet with you and [] Harper. However, I am going to also ask, or beg, to please get something scheduled with [] Axelrod. Another week has gone by and there is still no change to the situation I am in. I need to say out loud, that the isolation is getting to me and to the department. I have a new NP that started today and I cannot even go downstairs and greet her. [] Axelrod is not being helpful in getting any sort of orientation set up for her and we are setting up another provider to fail. . . . I am unable to go downstairs and help her and Axelrod doesn't want me to set up anyone else to help her . . . .
>
> I now have another list of complaints about [] Shoemaker and I have a concern that one of the complaints from last week is a much larger issue than when I spoke to [] Harper about it on Wednesday.

Dkt. 70-47 at 1. The meeting with Axelrod never occurred. Axelrod also began removing Brunelle from meeting invitations and other communications related to her job responsibilities. Dkt. 70-51; Dkt. 70-52.

Brunelle followed up time and again with various staff at PeaceHealth about a meeting but was brushed off. Dkt. 70 ¶¶ 184–187; Dkt. 70-47 at 1 ("I don't believe that I should have to beg every week for someone to respond to me or to follow up on what they have told me is going to happen."). In January 2022, she decided to take medical leave, having suffered anxiety as a result of the ongoing situation. Dkt. 70 ¶ 188.

1     While on medical leave, PeaceHealth human resources staff contacted her about finally

2 scheduling the meeting with Axelrod. Dkt. 70-54 at 1; Dkt. 70-56 at 2. Though Brunelle did not

3 want to meet while on leave, she did confirm she wanted to schedule something before her

4 return. *See* Dkt. 70-56 at 2-3. No meeting was scheduled. *See generally id.* On February 28,

5 2022, Brunelle emailed Rahn about scheduling a meeting, but again failed. *Id.* at 2–3. Brunelle

6 decided to extend her leave until the end of March. Dkt. 70 ¶ 192. After hearing nothing about

7 scheduling a meeting, she decided to remove her things from her office. *Id.* On March 30, Rahn

8 emailed her about her plan to return to work in April. Dkt. 70-56 at 2. Rahn and others requested

9 repeatedly that she return to work, expressing that they truly hoped she would come back to

10 PeaceHealth. *See id.* Brunelle responded that because nothing had changed, she did not know if

11 she could return. *See* Dkt. 70-56 at 1. Despite another email from human resources letting her

12 know that they had hired a facilitator for a meeting between her and Axelrod, Brunelle resigned

13 on April 13. Dkt. 70 ¶ 193–94; Dkt. 70-57.

14     Plaintiffs Brunelle and Adelstein jointly filed this case on July 11, 2022. Dkt. 1. Plaintiffs

15 allege claims for (1) whistleblower retaliation under the FCA; (2) retaliation under the WLAD;

16 (3) breach of contract; (4) wrongful discharge in violation of public policy; (5) aiding unfair

17 practices. Dkt. 1 at 42–49. The Court dismissed Plaintiffs' FCA claims against Defendant

18 Axelrod. Dkt. 21. In advance of briefing these motions, Plaintiffs agreed to dismiss their breach

19 of contract claims and any claim for punitive damages. Dkt. 65 at 1, n. 1.

20     On August 2, 2024 Defendant PeaceHealth moved for summary judgment. Dkt. 59.

21 Defendant Axelrod similarly moved for summary judgment on August 9. Dkt. 64. Plaintiffs

22 responded on September 2. Dkt. 83. The motions are ripe for the Court's determination.

23

24

## II.  SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323.

Generally, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Thus, at summary judgment, the court must resolve "factual issues of controversy in favor of the non-moving party[.]" *Lujan,* 497 U.S. at 888 (internal quotations omitted).

### III.   DISCUSSION

**A.    Defendants' Objections to Plaintiffs' Evidence are Premature.**

Before delving into substantive matters, the Court must address several evidentiary arguments Defendants raise in their briefing. *See generally* Dkt. 93 at 1–6. Defendants contend that most of Plaintiffs' material evidence is inadmissible. *See generally id.* Defendants thus conclude that Plaintiffs are unable to create any issue of material fact. *Id.* at 1. The Court disagrees.

The evidence relied upon by the nonmoving party must be capable of presentation at trial "in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). At summary judgment, the Court's role is to determine whether there is sufficient evidence of that kind to create a genuine factual dispute. The Court does "not focus on the admissibility of the evidence's form" as it is presented in the summary judgment record. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (quoting *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)). Rather, courts "focus on the admissibility of its contents." *Id.* (quoting *Fraser*, 342 F.3d at 1036). If the contents of a document could be "presented in a form that would be admissible at trial . . . the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it" at this stage. *Id.* (citing *Fraser*, 342 F.3d at 1036); *see also City of Lincoln v. County of Placer*, 668 F. Supp. 3d 1079, 1087 (E.D. Cal. 2023) (explaining that objections based on hearsay, foundation, and authenticity are often overruled at summary judgment if "the substance could conceivably be made admissible at trial").

Defendants claim that much of Plaintiffs' evidence is hearsay. Dkt. 93 at 3–4. Under Federal Rule of Evidence 801(c), hearsay is inadmissible at trial. Hearsay is defined as an out of court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). But there are numerous exceptions and exclusions to this blanket rule. *See, e.g.*, *McEuin v. Crown Equip.*

*Corp.*, 328 F.3d 1028, 1038, n. 2 (9th Cir. 2003), as amended on denial of reh'g and reh'g en banc (June 17, 2003) (O'Scannlain, J., concurring) ("Whether an item of evidence is hearsay depends on the purpose for which it is offered."). Hearsay evidence relied on at summary judgment may often be presented either in an appropriate form or for an appropriate purpose at trial. *See Sandoval*, 985 F.3d at 666; *see also, e.g.*, *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1181 (9th Cir. 1988) ("[W]e consider the newspaper accounts not for the truth of the matters asserted . . ., but for the question of notice.").

Defendants argue that declarations from two former PeaceHealth employees are inadmissible hearsay and should "be disregarded entirely." Dkt. 93 at 3. But the contents of these declarations could "be presented in a form that would be admissible at trial—for example, through live testimony by the author[.]" *Sandoval*, 985 F.3d at 666. The "mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment." *Id.* (citing *Fraser*, 342 F.3d at 1036–37).

Similarly, Brunelle's meeting notes, though hearsay, may be admissible. Dkt. 93 at 4. The contents of the notes are "mere recitations of events" within her "personal knowledge and, depending on the circumstances, could be admitted into evidence at trial in a variety of ways." *Fraser*, 342 F.3d at 1037. Brunelle "could testify to all the relevant portions" from her "personal knowledge." *Id.* (citing Fed. R. Evid. 602). Or the notes could be used to refresh her recollection. *Fraser*, 342 F.3d at 1037 (citing Fed. R. Evid. 612). And if that fails, she may be able to read portions of the notes into evidence as a recorded recollection. *Fraser*, 342 F.3d at 1037 (citing Fed. R. Evid. 803(5)).

1

2

3

The same is true for the other statements Defendants object to, including patient complaints, "alleged other statements," and Plaintiffs' emails. Dkt. 93 at 3–4. Again, these too may be offered for a non-hearsay purpose or in some acceptable form.[1]

4

5

6

7

8

Defendants also oppose the use of recordings Brunelle took during the events described above. *Id.* at 2. Brunelle recorded at least 17 conversations with at least nine people. *Id.* Defendants are correct that Washington law prohibits recording a private conversation without all participants' consent. *See id.* (citing RCW 9.73.030(1)). Such recordings are inadmissible in state court civil proceedings. Dkt. 93 at 2 (citing RCW 9.73.050).

9

10

11

12

13

14

15

16

In opposition at oral argument, Plaintiffs relied on *United States v. Little*, 753 F.2d 1420 (9th Cir. 1984). In *Little*, the Ninth Circuit rejected an argument that California law prohibiting electronic eavesdropping applied in federal court. *Id.* at 1434. The Court explained, "[i]n this circuit, the rule regarding admissibility of evidence in a federal prosecution is clear and simple. Evidence obtained in violation of neither the Constitution nor federal law is admissible in federal court proceedings without regard to state law." *Id.* (citations omitted). Because Brunelle's recordings are not material to deciding this motion, the Court defers ruling on their admissibility until the parties can fully brief this issue in motions in limine.

17

18

19

20

Finally, Defendants are correct that Plaintiffs cannot create a question of material fact by contradicting their own deposition testimony. Dkt. 93 at 4 (citing *Nelson v. City of Davis*, 571 F.3d 924, 927–28 (2009)). Defendants request that the Court make factual findings that certain statements "contradict, rather than explain or clarify, prior testimony." Dkt. 93 at 4; Dkt. 92 at 2–

21

22

23

24

---

[1] Defendants oppose the use of Plaintiffs' medical records as well. *Id.* at 2–3. They argue that Brunelle's 2022 health care provider notes are inadmissible because they were not produced during discovery. *Id.* The Court need not rule on this objection because Brunelle's provider notes are not material to deciding this motion. Any dispute about the admissibility of these records at trial can be fully briefed through motions in limine.

6 (citing *Arnold v. Pfizer*, 970 F. Supp. 2d 1106, 1125 (D. Ore. 2013)). "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Nelson*, 571 F.3d at 927 (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)). But the rule "has its limits." *Nelson*, 571 F.3d at 928. It does "not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier testimony." *Id.* (quoting *Kennedy*, 952 F.2d at 266-67). Before applying the rule, the court must make a factual determination that the contradiction is nothing but a "sham." *Nelson*, 571 F.3d at 928 (quoting *Kennedy*, 952 F.2d at 267).

The Court need not conduct a sham affidavit inquiry because other evidence in the record either substantiates Plaintiffs' contentions in their declarations or creates factual disputes even absent the sworn statements. Where the Court has cited such statements in Plaintiffs' declarations, it has also noted the relevant evidence in the record.

The Court thus finds Defendants' evidentiary objections without merit at the summary judgment stage. Where applicable, the Court will consider these objections in full prior to or during trial.

**B.**   **Brunelle has Raised Questions of Material Fact as to Whether She Experienced Retaliation Under the FCA, but Adelstein Has Not.**

The False Claims Act (FCA) imposes liability for making a "false or fraudulent claim[] for payment" to the federal government. *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 411 (2005) (citing 31 U.S.C. § 3729(a)). In 1986, Congress amended the FCA to protect whistleblowers—those "who come forward with evidence their employer is defrauding the government"—from retaliation. *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996) (citation omitted). The provision protects whistleblowers' "investigation for, initiation of, testimony for, or assistance in an action filed or to be filed

under" the FCA. 31 U.S.C. § 3730(h). In 2009, Congress amended the retaliation statute to expand its coverage to include employees who take "efforts to stop 1 or more violations" of the FCA. *Mooney v. Fife*, No. 22-16328, 2024 WL 4341366, at *8 (9th Cir. Sept. 30, 2024) (quoting 31 U.S.C. § 3730(h)). Thus, an action need not have been filed, nor need one ever be filed, for a whistleblower's acts to be protected. *Mooney*, 2024 WL 4341366, at *8 (quoting *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1288 (11th Cir. 2021)).

To make out a prima facie case of retaliation under the FCA, employees must prove three things: 1) the employee engaged in conduct protected under the FCA; 2) the employer knew the employee was engaging in FCA protected conduct; and 3) the employer discriminated against the employee because of her protected conduct. *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1060 (9th Cir. 2011) (quoting *Hopper*, 91 F.3d at 1269).

Plaintiffs bring a retaliation claim under the FCA for investigating and reporting Shoemaker's billing practices. Dkt. 1 at 42–43. Construing the evidence in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, the Court finds that Brunelle has offered enough evidence that a reasonable jury could find she was retaliated against for FCA-protected reporting. But Adelstein has failed to offer sufficient evidence that he was retaliated against for reporting about Shoemaker.

> 1. *Plaintiffs engaged in protected conduct when they raised concerns about Dr. Shoemaker's alleged fraudulent billing.*

To be shielded by the FCA's anti-retaliation provision, an employee must have engaged in protected activity. The Ninth Circuit has developed a two-step test for determining if activity is protected. First, a court considers whether the employee "in good faith believe[d]" that "the employer [was] possibly committing fraud against the government." *Moore v. Cal. Inst. Of Tech. Jet Propulsion Lab'y*, 275 F.3d 838, 845–46 (9th Cir. 2002) (citing *LeVine v. Weis*, 90

Cal.App.4th 201, 209–10, 108 Cal.Rptr.2d 562 (2001)); *see also Mooney*, 2024 WL 4341366, at *9. Second, a court asks if a "reasonable employee in the same or similar circumstances" would also believe that the employer was possibly committing fraud against the government. *Moore*, 275 F.3d at 845–46 (citing *LeVine*, 90 Cal.App.4th at 209–10). The Ninth Circuit has noted that "this test does not set a high bar." *Mooney*, 2024 WL 4341366, at *9. And very little evidence is needed to meet this first hurdle. *See Sicilia v. Boeing Co.*, 775 F. Supp. 2d 1243, 1250 (W.D. Wash. 2011) (finding employee's declaration and deposition testimony that he believed employer was committing fraud, along with evidence that employee told employer of concerns, sufficient to support an inference that employee engaged in protected activity).

Both Plaintiffs have submitted sufficient evidence to show that they "in good faith believed" that PeaceHealth was committing fraud against the government. *See Moore*, 275 F.3d at 846. First, Brunelle has provided evidence to show that she had a good faith belief that 1) Shoemaker had submitted a charge for a patient he had not seen; and 2) Shoemaker may have made this same mistake in the past. *See* Dkt. 70 ¶ 55–60; Dkt. 70-15; Dkt. 70-18.

On May 24, 2021, Brunelle learned that Shoemaker had missed a patient and filed a report about the incident. Dkt. 70-13. Brunelle reviewed the report on May 27. She thought the note "was written in a way that would not lead a reviewer of the note to understand that the patient had not been seen by a provider" and so she "worried that a billing charge had been submitted inappropriately for a service not provided." Dkt. 70 ¶ 60. She "went into the charges for the patient and determined that in fact a charge had been filed." *Id.*; *see also* Dkt. 70-15. She notified Rahn "and then worked with the billing department to have the charge reversed." Dkt. 70 ¶ 60; Dkt. 70-15. In conversations with billing, Brunelle learned the patient had both private insurance and Medicaid. Because Medicaid was a secondary insurer, the government had

not been billed. Dkt. 70-16 at 1–2. Had the charge not been reversed, Medicaid would have likely been billed. *See id.*

Brunelle then reviewed trainings from both PeaceHealth and the relevant government agencies about Medicaid fraud. *See* Dkt. 70 ¶ 64–66; Dkt. 70-17; 70-18. She concluded that, even though Medicaid had not been billed, she was required to submit a report to OI. Dkt. 70-17; 70-18. She submitted a report shortly thereafter. Dkt. 70-17; Dkt. 70-18.

Brunelle's concerns did not end there. In follow-up conversations with Axelrod and others, Brunelle learned that Shoemaker "did not know for sure whether he should, or should not, so he did" bill for the patient. Dkt. 70-19. Brunelle knew that he had missed patients in the past because of staff reports. Dkt. 70 ¶ 55–56 ("I had known of at least two other times in which Dr. Shoemaker had worked shifts in which a patient had not been seen. . . . On many prior occasions staff had expressed to me doubts that Dr. Shoemaker had seen all the patients that he was supposed to see on the unit."). She thought it possible that Shoemaker had similarly billed for patients he had not seen. *See* Dkt. 70 at 17-18. Given the patient population Longview serves, it is possible that any other improperly filed charges may have resulted in fraudulent government billing.[2] This evidence is sufficient to show that Brunelle in good faith believed there may be fraud on the government.

The same is true of Adelstein. Adelstein heard about the billing charge from Shoemaker. Dkt. 71 ¶ 39. As Adelstein explained,

> When I had learned that he had submitted a charge for a patient he did not see, I saw the fact that his notes were strangely devoid of substance as a possible

---

[2] SJMC often serves patients with "acute psychiatric needs." Most of the patients are "admitted involuntarily" or "suffer[] from a mental disorder that prevent[s] them from providing for their basic needs." Dkt. 70 ¶ 13. As Brunelle explained in the context of the incident above, when a patient is involuntary, they may have Medicaid. *See* Dkt. 70-16. Whether a primary or secondary insurer, this means Medicaid may be billed for services provided. *See id.; see also* Dkt. 82 at 2 (describing the "extremely vulnerable" patient population at SJMC).

indicator that he was regularly submitting notes on patients he did not assess but had simply written a note that would include from second-hand sources the minimum information to meet billing requirements and then submit a charge.

*Id*. Adelstein subsequently submitted a report to OI. Dkt. 71 ¶ 40.

Defendants argue that Adelstein's report was too "generic" to be protected activity. Dkt. 65 at 24. Adelstein's report is brief. *Id.* at 24–25. The report "lack[s] any reference" to Shoemaker or PeaceHealth defrauding the government. *Id.* at 25. But the report notes that Shoemaker "has probably written notes and billed for many patients he has not actually seen." *Id.*

Defendants cite to several cases to argue that Adelstein's report was deficient. *Id.* at 24 (citing *U.S. ex rel. Benaissa v. Trinity Health*, No. 4:15-cv-159, 2018 WL 6843624, *15 (D.N.D. Dec. 31, 2018), aff'd, 963 F.3d 733 (8th Cir. 2020); U.*S. ex rel. Lim v. Salient Fed. Sols. Inc.*, No. 16-cv-740-GPC-AGS, 2018 WL 2128666, *5 (S.D. Cal. May 9, 2018); *U.S. ex rel. Lockyer v. Haw. Pac. Health*, 490 F. Supp. 2d 1062, 1085 (D. Haw. 2007), aff'd in part, 343 F. App'x 279 (9th Cir. 2009)). But there are key differences between the facts of these cases and the present action. In *Lockyer*, the plaintiff requested compensation data (an "investigatory activity"), but he did so because he suspected that his own salary was being "shorted." 490 F. Supp. 2d at 1083–84. His deposition testimony and other evidence contradicted any assertion that the request was part of an investigation into suspected fraud. *Id.* In *Lim*, the court found that the plaintiff's generic reporting was sufficient to establish protected activity, but the complaints, "couched in terms of 'concerns' rather than threats or warnings of the possibility of the FCA litigation" were insufficient to constitute notice to an employer. 2018 WL 2128666, at *5.

By contrast, in *Sweeney v. Manorcare Health Servs., Inc.*, No. C03-5320RJB, 2006 WL 1042015 (W.D. Wash. Apr. 5, 2006), the court found that generic reporting to supervisors that

practices might result in "illegal conduct in regards to billing for service not provided" was enough to constitute protected activity. Adelstein's report, though brief, is likewise sufficient.

Even if Plaintiffs genuinely believed that PeaceHealth was engaged in fraud, their claims would fail as a matter of law if they cannot show that the belief was objectively reasonable. *Sicilia v. Boeing Co.*, 775 F. Supp. 2d 1243, 1250 (W.D. Wash. 2011) (citing *Moore*, 275 F.3d at 845). The objective test asks whether "a reasonable employee in the same or similar circumstances might believe" that "the employer is possibly committing fraud against the government." *Moore*, 275 F.3d at 845. Determination of what a "reasonable employee in the same or similar circumstances might believe" is a fact intensive inquiry, one not typically appropriate for resolution at this stage. *Sweeney*, 2006 WL 1042015, at *7.

A jury could find that "a reasonable employee" would have made the same conclusions as Plaintiffs regarding Shoemaker's billing practices. They could conclude that Shoemaker had submitted an improper bill that would induce a fraudulent Medicaid payment. They could also conclude that similar bills had been submitted in the past. Thus, under the second prong of the protected activity test, a jury could conclude that a reasonable employee in the same or similar circumstances might believe that PeaceHealth was attempting to defraud the government in violation of the FCA. *See Moore*, 275 F.3d at 846 (relying on the same evidence for the subjective/objective prongs).

Nevertheless, Defendants maintain that because Brunelle knew the charge was reversed, a reasonable employee in the same situation would not have believed PeaceHealth was defrauding the government. Dkt. 65 at 28–29. First, when Brunelle initially began investigating, she did not know the charge was being reversed. Dkt. 70-16 at 1–2. Second, even after the charge was reversed, she concluded she should report to OI. Dkt. 70-17; 70-18. It is a question for the jury whether a reasonable employee would have reached the same conclusion. Third, as

Brunelle explained, she remained concerned that a provider who had worked for the hospital for twelve years was unaware that he had improperly billed for a service. Dkt. 70 at 17–18. The same is true for Adelstein. Dkt. 66 at 77 ("This [report] was in response to the incident that the staff and Dr. Shoemaker were . . . discussing, and I had mentioned that additional information because I thought it supported the fact that this had likely be going on and may have even confirmed suspicions that I had and had reported for a long time.").

Because Plaintiffs' evidence is "to be believed, and all justifiable inferences are to be drawn in [their] favor," *Anderson*, 477 U.S. at 255, the Court concludes that they have provided sufficient evidence to raise a question about whether PeaceHealth employees were "possibly committing fraud against the government." *See Mooney*, 2024 WL 4341366, at *9.

### 2. PeaceHealth knew that both Plaintiffs engaged in protected activity.

Retaliation can occur only if the employer knew the employee was engaging in FCA-protected conduct. *Cafasso*, 637 F.3d at 1060 (citation omitted). "An allegation of knowledge is not a high bar." *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 908 (9th Cir. 2017). The employee need not explicitly say that they are engaging in protected activity, nor do they need to say that they are investigating an FCA violation. *See Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008); *see also Mooney*, 2024 WL 4341366, at *13. They need only raise an alarm about fraud on the government. *See Mendiondo*, 521 F.3d at 1103. For example, in *Mendiondo v. Centinela Hospital*, the court held that simply informing an employer that an employee was vaguely concerned about "civil violations" could be "construed to include [] suspected Medicare fraud." *Id.* at 1104. Raising an issue of improper billing alone may be sufficient. *See Mooney*, 2024 WL 4341366, at *13.

Both Brunelle and Adelstein have provided similar evidence that PeaceHealth knew they were engaging in FCA protected activity.

First, Brunelle has provided sufficient evidence that PeaceHealth knew she was attempting to report and stop possible Medicaid fraud.[3] Brunelle reviewed Shoemaker's incident report about his missed patient and became concerned that he had fraudulently billed for the patient's care. Dkt. 70 ¶ 60. She notified staff that the charge could have resulted in or been seen as fraudulent billing. Dkt. 70-15 ("This is a bigger issue to me than him accidentally not seeing a patient as it could be seen a fraudulent billing.").

Brunelle continued to raise concerns that Shoemaker had billed fraudulently in the past, noting that it seemed implausible that a provider who had been working in the field for twelve years did not know he should not bill for a patient he had not seen. Dkt. 70 at 17–18. In meetings and emails, Brunelle noted repeatedly that she did not think the billing charge was an isolated incident. Dkt. 70 ¶ 112. *See Mooney*, 2024 WL 4341366, at *13 (holding that raising concerns at 4–5 weekly meetings was sufficient evidence that employer was on notice of employee's effort to stop FCA violations). This activity began on May 27, 2021, and continued through her resignation in April 2022. *See* Dkt. 70 ¶ 60. Insofar as these actions detailed Brunelle's investigating and reporting of Shoemaker's billing charges, PeaceHealth knew that she was engaging in protected activity.[4]

---

[3] Defendants originally argued that PeaceHealth could not have known about Brunelle's protected activity because reporting and compliance were part of her regular duties. Dkt. 93 at 10–12. Defendants have since withdrawn this argument in light of the Ninth Circuit's ruling in *Mooney v. Fife*, 2024 WL 4341366, at *12. In *Mooney*, the Ninth Circuit clarified that there is no difference between an employee bearing compliance duties from those who do not. The Ninth Circuit explained that such a dichotomy was "inconsistent with, indeed the opposite of" the text and intent of the FCA. *Mooney*, 2024 WL 4341366, at *12. Thus, "[r]egardless of whether the employee has compliance duties, to satisfy the . . . notice requirement . . . the employer need only be aware of an employee's 'efforts to stop 1 or more violations of [the FCA]." *Id.* at *12 (citing 31 U.S.C. § 3730(h)(1)).

[4] As explained above, for purposes of an FCA claim, the employee must have been reporting concerns related to fraud on the government. *See, e.g.*, *Mooney*, 2024 WL 4341366, at *8 (quoting

1    Adelstein has also raised issues of fact as to his protected activity. Adelstein points to his

2    OI report, but this is insufficient. Dkt. 65 at 25. As Defendants correctly note, the report was

3    anonymous and "there is no evidence that PeaceHealth knew that Adelstein submitted an internal

4    report." *Id.* Until PeaceHealth knew that Adelstein had submitted the report, they did not know

5    that he was engaged in FCA protected activity.

6        But on July 12, Brunelle told Axelrod that Adelstein had submitted an anonymous report

7    to OI. Dkt. 70-26 ("I know that [Adelstein] came to me after hearing staff discuss the billing

8    investigation happening and he told me that he was a mandated reporter and was going to report

9    it. I told [Adelstein] that if he felt that way, he should report it"). As of July 12, a jury could find

10   that Axelrod and PeaceHealth knew that Adelstein was engaging in protected activity. A jury

11   could thus find that any retaliatory acts that occurred after that date were made with knowledge

12   that Adelstein had engaged in protected activity.

13        *3. Brunelle, but not Adelstein, has shown a question of material fact as to whether she
          was retaliated against because of protected activity.*

14       To prove the final element of their prima facie case, Plaintiffs must show that they

15   suffered retaliation because of their protected activity. *Cafasso*, 637 F.3d at 1060 (quoting

16   *Hopper*, 91 F.3d at 1269). The "legislative history of the FCA states that the employee must

17   show that 'the retaliation was motivated at least in part by the employee's engaging in protected

18   activity.'" *Sweeney*, 2006 WL 1042015, at *8 (W.D. Wash. Apr. 5, 2006) (quoting *McKenzie v.

19   BellSouth Telecommunications, Inc.*, 219 F.3d 508, 518 (6th Cir. 2000)).

20       An action constitutes retaliation under the FCA if it would also be an "adverse

21   employment action" under Title VII's retaliation provisions. *Moore*, 275 F.3d at 847. The

23
24   31 U.S.C. § 3730(h)); *Hopper*, 91 F.3d at 1269. Thus, other complaints Brunelle made about
     Shoemaker's clinical and professional conduct are irrelevant here.

Supreme Court and the Ninth Circuit have since adopted a "simple 'reasonableness' standard for adverse employment actions that evaluates reasonableness from the point of view of the employee." *Id.* (citing *Ray*, 217 F.3d at 1243). The "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). A plaintiff must show that a "reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington*, 548 U.S. at 68 (cleaned up).

To be considered an adverse employment action, an action need not have "materially affect[ed] the terms and conditions of employment[.]" *Moore*, 275 F.3d at 847 (quoting *Ray*, 217 F.3d at 1242). Rather, an action "may be cognizable . . . under the [FCA] . . . if it is reasonably likely to deter employees from engaging in activity protected under either of those statutes." *Id.* (citing *Ray*, 217 F.3d at 1243); *see also Hellman v. Weisberg*, 360 F. App'x 776, 778 (9th Cir. 2009) (quoting *Burlington*, 548 U.S. at 78); *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2003), as amended (Jan. 2, 2004).

Defendants question whether Plaintiffs even experienced retaliation. Dkt. 65 at 25–26, 31. Thus the Court first addresses if Plaintiffs have offered sufficient evidence to raise a question of material fact as to whether they were retaliated against. The Court then turns to causation, discussing whether Plaintiffs have similarly provided admissible evidence about the relationship between Defendants' acts and Plaintiffs' harms.

   a. *Brunelle experienced retaliation that may be an adverse employment action.*

Brunelle alleges two adverse employment actions. Dkt. 1 ¶¶ 189–90. First, Brunelle alleges that the threats and intimidation she endured were actionable under the FCA. *Id.* ¶ 189.

1    Even absent constructive discharge, a court may find that Axelrod's threats or harassment

2    amount to an actionable violation of the FCA. *See Moore*, 275 F.3d at 847 (district court

3    correctly concluded that actions "did not amount to a constructive discharge" but district court

4    erred in finding that employer's actions "also did not amount to threats or harassment that might

5    be actionable under the" FCA). Second, Brunelle alleges that she was constructively discharged.

6    Dkt. 1 ¶ 190.

7         A jury could conclude that PeaceHealth's actions were "reasonably likely to deter

8    employees from engaging in activity protected" by the FCA. *Moore*, 275 F.3d at 848. On

9    September 17, 2021, Axelrod emailed Brunelle threatening legal action for speaking about his

10   actions to other PeaceHealth employees. Dkt. 70-38. PeaceHealth itself concluded that "the tone

11   and language were deemed retaliatory in nature." Dkt. 63-26 at 1. A jury looking at the text of

12   this email could conclude the same. A jury could find that the email was intended to discourage

13   Brunelle from engaging in protected activity.

14        Axelrod took several other actions, though minor, against Brunelle. On November 23,

15   Brunelle emailed providers about the December call schedule. Dkt. 70-51 at 1. Shoemaker

16   responded about certain assignments. *Id.* Axelrod then responded to Shoemaker and dropped

17   Brunelle, adding a different administrator, who forwarded the email chain to her. *Id.* at 1.

18        On December 2, Holly Blondino scheduled time to meet with Brunelle, Axelrod, and

19   Rahn to review hospital admissions policies. Dkt. 70 ¶ 184; 70-52. She set up five meetings.

20   Dkt. 70-52. Axelrod rescheduled each meeting, removing Brunelle from the calendar invitation

21   each time. *Id.* Brunelle reported this behavior to Rahn. Dkt. 70 ¶ 184; Dkt. 70-52.

22        Defendants cite to several cases to argue that these incidences are not adverse actions. In

23   *Hellman v. Weisberg*, 360 F. App'x 776, 779 (9th Cir. 2009), the Ninth Circuit held that a judge

24   telling an employee that he "wanted to fire her and have her criminally prosecuted" was

"insufficient to support her Title VII claims" as it was "undisputed that [plaintiff] was never fired or prosecuted, and the mere threat of termination does not constitute an adverse employment action." *Id.* Similarly a "one-time verbal reprimand had no effect on her job duties" and did not constitute an adverse action. *Id.* Notably, *Hellman* is not a retaliation case, and the standard there is different. The adverse actions here need not affect the terms and conditions of employment. *Moore*, 275 F.3d at 847 (citing *Ray*, 217 F.3d at 1243). They need only "reasonably deter employees from engaging in [protected] activity." *Moore*, 275 F.3d at 847 (citing *Ray*, 217 F.3d at 1243).

Defendants also quote *Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005), amended by 433 F.3d 672 (9th Cir. 2006), and 436 F.3d 1050 (9th Cir. 2006). There, the Ninth Circuit held that "snide remarks" about a harassment claim and thinly veiled threats were not enough to constitute retaliation. And Defendants cite *Kuntz v. Tangherlini*, No. C14-152 MJP, 2015 WL 1565910, at *3 (W.D. Wash. Apr. 8, 2015). There, the court noted that "a review of the types of employment circumstances which have failed to qualify as 'adverse actions' in the retaliation context includes . . . snubbing, threats of termination, verbal reprimand, ostracism, rudeness, and denial of leave." *Id.* (citing cases).

But because the adverse action inquiry is highly context-specific, there are also cases reaching the opposite result on similar facts. Most importantly, in *Burlington Northern*, 548 U.S. at 69, the Supreme Court acknowledged that "to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." The nature and result of the actions depends on the context. The Court explained, "an 'act that would be immaterial in some situations is material in others.'" *Id.* (quoting *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)).

Looking to what courts have termed "petty slights" is also instructive. For example, one court found a comment such as "Here we go again. You are going to call diversity[]" to be insufficient. *Gonzalez v. Nat'l R.R. Passenger Corp. (Amtrak)*, No. C08-0093 MJP, 2009 WL 854081 (W.D. Wash. Mar. 27, 2009), aff'd sub nom. *Gonzalez v. Nat'l R.R. Passenger Corp.*, 376 F. App'x 744 (9th Cir. 2010). The same has been found true of "simple exclusion from lunch with a supervisor." *Blount v. Morgan Stanley Smith Barney LLC*, 982 F. Supp. 2d 1077 (N.D. Cal. 2013), aff'd, 624 F. App'x 965 (9th Cir. 2015). Being treated "generally less kindly" is similarly not enough for a "reasonable factfinder" to conclude materially adverse conditions. *Sillars v. Nevada*, 385 F. App'x 669, 671 (9th Cir. 2010).

The events of this case do not fall neatly into the cases discussed above. Rather they lie somewhere between "petty slights" and those actions that are plainly adverse. Considering Axelrod and PeaceHealth's "actions as a whole, a reasonable jury could conclude that these actions were reasonably likely to deter employees from engaging in activity protected under [the FCA]." *Moore*, 275 F.3d at 848.

Defendants also point to actions PeaceHealth took to support Brunelle and hold Axelrod accountable as evidence that a reasonable employee would not have been deterred by Axelrod's actions. *See* Dkt. 65 at 33; Dkt. 63-26. PeaceHealth did investigate and put Axelrod on a PIP in response. Dkt. 63-26 at 1–2. Brunelle alleges the PIP was a "sham." Dkt. 82 at 25. But the emphasis here remains on the effect of Axelrod's email and the events surrounding it, rather than on any resolution that occurred after. *See e.g.*, *Ramirez v. Olympic Health Mgmt. Sys., Inc.*, 610 F. Supp. 2d 1266, 1284–85 (E.D. Wash. 2009), amended on reconsideration, No. CV-07-3044-EFS, 2009 WL 1456469 (E.D. Wash. May 22, 2009). Axelrod's actions could still "deter reasonable workers from" reporting and "[t]his is a jury question." *Id.* at 1285.

Brunelle also alleges that she was ultimately forced to resign from her role at Peace Health. Dkt. 1 ¶ 189–90; Dkt. 83 at 45–51. Forced resignation is often called "constructive discharge." Constructive discharge "occurs when the working conditions deteriorate, as a result of [retaliation], to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job." *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000). Constructive discharge requires "conditions so intolerable that a reasonable person would leave the job." *Brooks*, 229 F.3d at 930.

Whether conditions were "so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury." *Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir. 1990). That said, the Ninth Circuit has held that "a single isolated incident is insufficient as a matter of law to support a finding of constructive discharge." *Id.* (citing *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987)). Thus, a plaintiff alleging constructive discharge must show some "aggravating factors, such as a continuous pattern of discriminatory treatment." *Id.* (cleaned up).

There are issues of material fact as to whether Axelrod and other PeaceHealth employees' actions were enough to constitute a work environment so "intolerable" that a reasonable person would leave the job. *See Brooks*, 229 F.3d at 930.

In addition to the events laid out above, Axelrod refused to meet with Brunelle to attempt to resolve their conflict. Torres, who was also meeting with Brunelle at the time, knew this. Dkt. 73-21 at 3. The Torres and Axelrod texted back and forth. *See generally id.* Torres asked Axelrod why he declined the meeting. *Id.* Axelrod responded: "Right now I feel completely unprotected from Hr, so I don't think it is safe or appropriate for me to meet with Jess . . . HR has totally messed this up." *Id.* Torres replied, "I hear you[.]" *Id.*

Finally, Brunelle maintains that PeaceHealth staff forced her to isolate in her office, interfering with her ability to perform her job. What exactly occurred remains in dispute. Brunelle claims that she was "confined to her office." Dkt. 82 at 48. Defendants claim the confinement was "self-imposed." Dkt. 59 at 34.

Text message exchanges between Brunelle and Glaser indicate that there was communication around the issue. Dkt. 70-21 at 4. ("Am I just supposed to see him in the lobby Monday and say good morning and walk away like everything is fine?" "We can connect before you return to the office, if that's helpful. Please know that there is a lot going on to resolve this issue.") Texts between Brunelle and others show the same. Dkt 70-41 ("She asked if I needed a place to work for the week to minimize contact with Rob. If he is at main, can you be at Broadway, etc. I told her that Rob only is working on the ground floor and I can come upstairs directly and work at Broadway without having to worry about running into him. She said that was a good plan and she would check in with me tomorrow.") Staff observed that Brunelle could not leave her office, though whether it was her choice or that of others was unclear. Dkt. 75 ¶ 27 ("At some point in the fall of 2021 I observed that Ms. Brunelle seemed to be confined to her office. Though she did not share with me the particulars of what she was going through, she appeared to be under significant distress.").

Defendants point to excerpts of Brunelle's deposition transcript to argue that she has conceded the confinement was voluntary. Dkt. 65 at 20. The transcript itself tells a slightly different story:

> Q. . . . At some point you had a conversation with Malisa Glaser about being in your office; is that right?
>
> A. Mm-hmm.
>
> Q. And was that – is it your – why were you in your office?
>
> . . .

[A.] So in the meeting that I had with Shaun Harper and Malisa Glaser right after I returned from Hawaii, Malisa asked me if I could either work for home or if I could -- or if she could find me a different office to work out of until we got the meeting scheduled with Rob that she was hoping to have scheduled by the end of that week.

And she told me that she didn't want me to have a run-in with him before our -- I can't remember what the word I'm trying to find is -- our mediated -- I don't know if "mediated" is the right word -- but before our conversation that we had where somebody sat down and helped us get through some of these issues.

. . .

Q. And was there anything else in that discussion you just described with Ms. Glaser that you remember her or yourself saying?

A. Yes. So when she offered to find me another office to work in, I told her that because Dr. Axelrod's office is located on the first floor and I was on the second floor and it was during the middle of COVID so everybody had to keep their doors closed and stuff, there was no reason for us to cross paths in the building except for first thing in the morning. And if I came up the back stairs instead of going through the main entrance, that I wouldn't run into him, so I didn't think it was necessary to get me a different office, that I could work in my own office and

still not run into him.

. . .

Q. Did you understand Ms. Glaser, in that meeting, to say that you needed to stay in your office?

A. Not in that meeting, but later when – after Dr. Axelrod had said he didn't want to meet or he turned down the meeting request, I talked to Malisa again. And I said "Well, how long -- you know, now I'm in limbo. How long do I have to go on, you know, avoiding him?"

And she told me that, "You have a right to feel safe when you come to work, and I would say that you need to do what you need to do to keep yourself feeling safe. And if – well -- if that takes until we get the meeting scheduled, then that's what happens," or something like that.

Dkt. 94-1 at 25–27. To the extent that Brunelle thought she had to either move offices or confine herself to her present office, a jury could find she reasonably understood the confinement as a directive. And she may have understood Glaser's directive to avoid a run-in as a similar instruction. Taken in the light most favorable to Brunelle, these facts could establish an adverse action. Brunelle has provided enough admissible evidence that a reasonable jury could find that

Axelrod and PeaceHealth retaliated against her, and that their actions over the course of several months created an intolerable working environment. We move on to the issue of causation.

>    b.   *A jury could conclude PeaceHealth retaliated against Brunelle because of her protected activity.*

Plaintiff may establish causation with "circumstantial evidence, such as the employer's knowledge that [she] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Erickson*, 417 F. Supp. 3d at 1383 (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)). The issue "presents a 'fairly low bar.'" *Matthews v. Karcher N. Amer., Inc.*, No. 3:21-CV-05732-LK, 2023 WL 3318613, at *8 (W.D. Wash. May 9, 2023) (quoting *Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 388 (Wash. Ct. App. 2020)).

The Ninth Circuit has held that "causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1094 (9th Cir. 2008) (first quoting *Villiarimo*, 281 F.3d at 1065; and then citing *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 507 (9th Cir. 2000)). Courts have not set forth an exact time frame for temporal causation. But the Ninth Circuit has found an eighteen-month gap "too long[.]" *See Villiarimo*, 281 F.3d at 1065. Fifty-nine days was close enough. *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505 (9th Cir. 1989). Similarly, "when adverse employment actions were taken more than two months after the employee filed an administrative complaint, and more than a month and a half after the employer's investigation ended," causation could be inferred. *Yartzoff*, 809 F.2d at 1376.

Defendants argue that "Brunelle lacks evidence sufficient to infer a causal link between claimed FCA-related conduct . . . and Axelrod's September 17 email." Dkt. 93 at 12. Brunelle's first act occurred in June when she reported the submitted charge. Dkt. 70-15. Brunelle then

submitted the OI report. Dkt. 80-6. She continued to follow up on the issue in the intervening

months. Dkt. 73-21 at 1 (January 2021 texts between Torres and Axelrod: "Omg . . . Jessica is

continuing with her complaints"). On September 17, Axelrod sent the email berating her for

discussing the issue. Dkt. 70-38. At two to three months, the gap is not so large that a reasonable

jury could not find the two are related.

Causation for Brunelle's constructive discharge claim is less clear. In January 2022,

Brunelle took medical leave. Dkt. 70 ¶ 188. She resigned shortly thereafter in April 2022.

Dkt. 70-57. Axelrod's possible retaliatory acts continued through October. Dkt. 70-51; Dkt. 70-

52. The fallout from these acts continued through January, and Brunelle's confinement (whether

by choice or directive) continued until she took leave. *See* Dkt. 70-47 at 1; *see* Dkt. 70-52 at 2. A

reasonable jury could find either that Brunelle's resignation is too attenuated from the alleged

retaliatory acts or that the entire course of action was retaliatory and caused her constructive

discharge. That decision requires weighing the evidence and the credibility of witnesses—tasks

that must be undertaken by the jury, not the Court. For these reasons, Defendants' motion for

summary judgment on Brunelle's FCA Claims is DENIED.

> c.    *The cancellation of Adelstein's June shifts occurred before his protected*
> *FCA activity, and he has failed to provide admissible evidence that he was*
> *"blackballed" from PeaceHealth.*

The Court turns now to Adelstein's claims. Adelstein alleges that PeaceHealth retaliated

against him for his June 21, 2021 anonymous report about Shoemaker's billing practices. Dkt. 65

at 25–26. Adelstein alleges that PeaceHealth canceled scheduled work shifts and terminated his

*locums* contract because of the report. *Id.* at 26; Dkt. 1 ¶ 188. But this claim fails because

workers at PeaceHealth, specifically Axelrod, were not aware that Adelstein had submitted the

anonymous report on June 21. Dkt. 1 ¶ 188. And Axelrod and others decided to cancel

Adelstein's shifts in early June. *See* Dkt. 70 ¶ 95; Dkt. 71-5 at 5–6.

Actions taken after July 12, when Axelrod and others became aware that Adelstein had filed the anonymous report, could be temporally connected to Adelstein's continued alarm-raising about Shoemaker's billing and Axelrod's alleged cover up. But Adelstein's claim fails for two reasons. First, Adelstein conceded that his conduct on July 12 did not cause cancellation of his September and October shifts. Dkt. 93 at 7; Dkt. 83 at 48. Second, Adelstein did not provide any admissible evidence to show that Defendants took prospective shifts or opportunities at other PeaceHealth facilities away from him. Defendants do concede in Axelrod's reply brief that Axelrod was looking elsewhere in the PeaceHealth system for work for Adelstein. Dkt. 92 at 7. But there is no evidence that any opportunities actually existed. *See id.*

Adelstein offers only one piece of evidence to argue that he was "blackballed." Dkt. 93 at 3–4. Adelstein describes texts from a psychiatrist at a different PeaceHealth facility who had reached out to him about providing coverage. *Id.* He alleges the friend then texted him "it's been announced you're out and don't let the door hit you in the ass on the way out." *Id.* ¶ 65. This could potentially be evidence to support Adelstein's theory. But Adelstein did not submit these messages into evidence. Dkt. 93 at 7. Plaintiffs did not depose the friend. *Id.* at 8. Nor did Plaintiffs submit a declaration from him. *Id.* Unlike other hearsay statements Plaintiffs have offered, Adelstein's statement about his friend's messages is offered for the truth of the matter asserted, could not be admissible at trial in any form, and goes to a dispositive issue in the case. For this reason, Adelstein lacks sufficient evidence from which a jury could find retaliation, and Defendants' motion for summary judgment on Adelstein's FCA claims is GRANTED.

**C.   Brunelle, but Not Adelstein, Has Raised Sufficient Questions of Material Fact to Survive Summary Judgment on Her Claims for Retaliation Under the WLAD.**

The WLAD similarly protects employees from retaliation by their employer for engaging in activity protected by the statute. *Milligan v. Thompson*, 110 Wn. App. 628, 638, 42 P.3d 418

(2002). The WLAD prohibits retaliation for opposing a practice an employee reasonably believes violates its terms. RCW 49.60.210; *Erickson*, 417 F. Supp. 3d at 1382 (citations omitted). As with FCA retaliation claims, the employee must make out a prima facie case of retaliation. *Erickson*, 417 F. Supp. 3d at 1382. The employee must show that 1) the employee engaged in protected activity; 2) they suffered an adverse employment action as a result; and 3) there was a causal connection between the two. *Id.* (citing *Curley*, 772 F.3d at 632); *see also Milligan*, 110 Wn. App. at 638.

WLAD claims "are typically inappropriate for resolution at summary judgment because the WLAD mandates liberal construction and the evidence will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." *Gamble v. City of Seattle*, 6 Wn. App. 2d 883, 431 P.3d 1091, 1094 (Wash. Ct. App. 2018) (cleaned up). At summary judgment, "the plaintiff's burden is one of production, not persuasion." *Cornwell v. Microsoft Corp.*, 192 Wash. 2d 403, 412–13, 430 P.3d 229 (2018).

The Court will, however, grant summary judgment against an employee who "fails to raise a genuine issue of fact on one or more prima facie elements." *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 27, 244 P.3d 438 (Wash. Ct. App. 2010); *see also Marquis v. City of Spokane*, 130 Wn. App. 2d 97, 105, 922 P.2d 43 (Wash. 1996) (to survive summary judgment, the employee "must do more than express an opinion or make conclusory statements," and "must establish specific and material facts to support each element of his or her prima facie case"). An employee "must show . . . that a reasonable jury could find that retaliation was a substantial factor in the adverse employment decision." *Cornwell*, 192 Wash. 2d at 412.

Here, Defendants have conceded that there are "material disputed facts" as to whether Plaintiffs engaged in protected activity under the WLAD. Dkt. 65 at 36, fn. 15. The Court therefore

considers only the other two prongs: whether PeaceHealth took an adverse action against them and whether there is a causal link between their protected activity and the adverse action.

       1.   *Brunelle has raised material questions of fact as to whether there was an adverse action taken against her for reporting under the WLAD, but Adelstein has not.*

An adverse action involves a change in employment that "is more than an inconvenience or alteration of one's job responsibilities." *Boyd v. State Dep't of Social and Health Servs.*, 187 Wn. App. 1, 13, 349 P.3d 864 (2015) (citing *Alonso v. Qwest Commc'ns Co., LLC,* 178 Wn. App. 734, 746, 315 P.3d 610 (2013)). This "includes a demotion or adverse transfer, or a hostile work environment." *Kirby v. City of Tacoma,* 124 Wash.App. 454, 465, 98 P.3d 827 (2004) (quoting *Robel v. Roundup Corp.,* 148 Wash.2d 35, 74 n. 24, 59 P.3d 611 (2002)).

For retaliation claims, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, meaning that it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boyd*, 187 Wash. App. 13 (quoting *Burlington,* 548 U.S. at 68). Whether an action "is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position.'" *Tyner v. State,* 137 Wash.App. 545, 565, 154 P.3d 920 (2007) (quoting *Burlington,* 548 U.S. at 71). This reasonableness assessment is generally a question of fact for a jury. *Boyd*, 187 Wn. App. 1, 13.

Under the WLAD, an employee may recover all actual damages that are proximately caused by a violation of the statute, including lost wages, even without proving a claim for constructive discharge. *Martini v. Boeing*, 137 Wn.2d 357, 363–372, 971 P.2d 45 (1999).

       a.   *Brunelle has offered sufficient evidence to support a WLAD claim for retaliation.*

Defendants argue that Brunelle's WLAD claim should be dismissed because she never suffered an adverse employment action. Dkt. 65 at 39. They contend that none of the actions

Brunelle cites amount to an adverse action because they never "caused her any cognizable injury." *Id.* They argue that, "whether styled as retaliation, hostile work environment, or constructive discharge, [Brunelle] lacks admissible evidence sufficient to create a question of fact." Dkt. 93 at 19. The court disagrees. Brunelle's claim for an adverse employment action under the WLAD mirrors her FCA claims. Just as above, looking at Axelrod's acts together, and the acts of PeaceHealth in response, "a reasonable jury could find that these actions, taken together, were materially adverse." *Hartman v. Young Men's Christian Ass'n of Greater Seattle*, 191 Wash. App. 1005, 2015 WL 6872184, at *11 (2015).

As explained above, Axelrod first began retaliating against Brunelle in September 2021. Axelrod began removing Brunelle from correspondence directly related to her job duties. Dkt. 70 ¶ 137; Dkt. 70-37 at 1-2. He then sent Brunelle an email threatening her if she continued discussing her concerns with other PeaceHealth employees. Dkt. 70-38. Despite leadership's insistence on mediating a meeting between Brunelle and Axelrod, such a meeting did not occur over an eight-month period. *See* Dkt. 70-44 at 1–2; Dkt. 70-56 at 2–3; Dkt. 70-57. Axelrod continued removing Brunelle from meetings and emails necessary to her job function. Dkt. 70-51; Dkt. 70-52. And finally, a reasonable jury could conclude Brunelle was forced to remain in her office while at work, interfering with her ability to perform her job duties. See Dkt. 70 ¶ 144; Dkt. 70-41 at 4.

Defendants are correct that these events are not as extreme as some of those cited in cases Plaintiffs' rely on. Dkt. 93 at 15–16. But they are still enough to merit the claim moving forward. Under the WLAD, if Brunelle proves that Defendants retaliated against her in violation of the WLAD, whether that retaliation caused her resignation is a question of damages, not liability. *See Martini*, 137 Wn.2d at 363–72. A reasonable jury could side with Defendants and decide that their acts were not enough to dissuade a reasonable person from reporting discrimination; they

1    could find that Defendants did retaliate, but that their actions did not cause Brunelle's lost wages

2    and award only non-economic damages; or they could find that Brunelle's loss of employment

3    was also proximately caused by unlawful retaliation. All that matters for resolving this motion is

4    that Brunelle has shown enough evidence to have these questions answered by the jury.

5    Defendants' summary judgment motions on Brunelle's WLAD claims are DENIED.

6            *b.   Adelstein has failed to raise a question of material fact for a WLAD claim.*

7            The Court turns now to Adelstein's claims. Adelstein alleges that he experienced

8    retaliation 1) following his February 15, 2021 email about quality-of-care concerns and 2) after

9    his July 12, 2021 statements to Axelrod about a possible cover up. Dkt. 83 at 53–54. He

10   maintains that the first stage of retaliation (for the February 15 email) began on June 15, when

11   Axelrod canceled his remaining shifts. *Id.* at 53. And he alleges that the second stage of

12   retaliation began after the July 12 call, when Axelrod withdrew support for Adelstein to work at

13   other PeaceHealth locations. *Id.* at 53, 55.

14           There is no evidence from which a jury could infer that Adelstein's protected activity was

15   the reason for the cancellation of his June shifts. First, Adelstein's WLAD protected activity took

16   place in February, while the alleged retaliation did not happen until June. *Id.* at 53–55. There is a

17   five-month separation between the two events. PeaceHealth has provided evidence that, during

18   that five-month period, they tried to hire Adelstein into a permanent position at SJMC. Dkt. 70-9

19   at 2. Those negotiations were unsuccessful, not because of any retaliation related to Adelstein's

20   reporting, but because Adelstein was not interested in the opportunity offered. *See id.*; *see also*

21   Dkt. 71-5 at 3 ("SJMC has a need for 7 day a week coverage with a hospitalist, and currently

22   don't have that. Our staffing need is dire . . . – we tried very hard to engage with you around

23   relief, hiring at a 0.6, offering to explore a perm/tele option, etc. I understand that you weren't

24   ready to commit to those offers but it's no secret that we have additional need.")

Throughout that period Axelrod also planned to schedule Adelstein as much as possible. Dkt. 70-8. When he told Adelstein on June 15 that he was hiring Urune and changing Adelstein's schedule, Axelrod noted that they retained a "vested interest" in keeping Adelstein in the PeaceHealth system. Dkt. 71-5 at 6. And in follow up messages, Axelrod told Adelstein there may be opportunities at SJMC in August. *Id.* at 5. There is no evidence of retaliation between February and June.

Adelstein also offers no evidence that he experienced retaliation related to reporting after his July call with Axelrod. This allegation mirrors Adelstein's FCA claim: Adelstein conceded that his conduct on July 12 did not cause cancellation of his September and October shifts. Dkt. 93 at 7; Dkt. 83 at 48. And Adelstein does not provide any admissible evidence to show that prospective shifts or opportunities at other PeaceHealth facilities were taken away from him because of reporting on the call. Even though Defendants have conceded that Axelrod was looking elsewhere in the PeaceHealth system for opportunities, Adelstein has failed to provide admissible evidence that such opportunities ever arose. Dkt. 92 at 7; Dkt. 93 at 7–8.

For this reason, Adelstein's WLAD claim fails. Defendants' motions for summary judgment on this claim are GRANTED.

**D.    Brunelle's Claim for Wrongful Discharge in Violation of Public Policy Survives.**

In Washington, "[a]n employer may discharge an at-will employee for 'no cause, good cause or even cause morally wrong without fear of liability.'" *Roe v. TeleTech Customer Care Mgmt. (Colo.) LLC*, 171 Wash.2d 736, 257 P.3d 586, 594–95 (2011) (quoting *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1085 (1984)). But "a narrow exception to the at-will employment doctrine prohibits an employer from terminating an employee 'for reasons that contravene a clear mandate of public policy.'" *Bell*, 599 F. Supp. 3d at 1079 (citations omitted). Discharge for engaging in whistleblowing activity is one of the actions for which an employee

may bring a wrongful discharge claim. *Id.* (citing *Dicomes v. State*, 113 Wash.2d 612, 782 P.2d 1002, 1006–07 (1989)). If an employee's activity is protected by the wrongful discharge tort, the employee must then establish a prima facie case of wrongful discharge in violation of public policy by showing that "(1) his discharge may have been motivated by reasons that contravene a clear mandate of public policy; and (2) his public-policy-linked conduct was a significant factor in the decision to discharge him." *Id.* (citing cases). An employee may bring a claim based on either express or constructive discharge. *Peiffer v. Pro-Cut Concrete Cutting & Breaking*, 6 Wn. App. 2d 803, 829, 431 P.3d 1018 (2018).

In the complaint, Plaintiffs both allege that they were discharged for reporting quality of care concerns. Dkt. 1 at ¶¶ 222–231. Plaintiffs argue that the State of Washington has a public policy in favor of reporting medical quality of care concerns and in favor of preventing unprofessional conduct by medical doctors. *Id.* at ¶ 223.

Defendants contend that Brunelle has failed to create a question of fact for wrongful discharge because she has failed to establish sufficient facts for a constructive discharge claim. Dkt. 93 at 20–21. As explained above, the Court disagrees with this characterization of the record. *See supra* section B(3)(a). Brunelle has submitted evidence sufficient for a jury to conclude that her resignation was the result of acts of retaliation for her reporting that over time made her work environment intolerable.

The Court turns second to Adelstein's claim. In their briefing, both Plaintiffs and Defendants debated whether Adelstein was an employee such that he could even bring a wrongful discharge claim. Dkt. 93 at 20; Dkt. 83 at 58–60. The Court need not resolve this question because Adelstein has, again, failed to show that he was discharged from PeaceHealth for protected reasons. Adelstein has failed to provide evidence that PeaceHealth and Axelrod canceled his shifts because of his protected activity. *See* Dkt. 70 ¶ 95; Dkt. 71-5 at 5–6. And Adelstein has failed to

provide evidence that any future opportunities were taken from him because of his protected activity. Dkt. 93 at 3–4; Dkt. 93 at 7. Even if he were considered an employee of PeaceHealth, his claim cannot move forward.

Therefore, Defendants' motions for summary judgment on this claim are DENIED as to Brunelle but GRANTED as to Adelstein.

### E.   Brunelle's Aiding and Abetting Claim Against Axelrod Survives.

Finally, Plaintiffs assert a claim against Defendant Axelrod for aiding and abetting unfair practices. Dkt. 1 at ¶¶ 233–34, 49. Because Adelstein claims the same retaliation here that he does under all his other claims, this claim on his behalf also fails.

RCW 49.60.180(3) states that it is an unfair practice for an employer "[t]o discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any . . . disability[.]" The law defines "employer" to include "any person acting in the interest of an employer, directly or indirectly, who employs eight or more persons[.]" RCW 49.60.040(3). The statute thus includes supervisors in the workplace. *Id.*; *see also Thompson v. N. Am. Terrazzo, Inc.*, No. C13-1007RAJ, 2014 WL 2048188, at *3 (W.D. Wash. May 19, 2014).

RCW 49.60.220 states that it is an unfair practice for "any person to aid, abet, encourage, or incite the commission of any unfair practice, or to attempt to obstruct or prevent any other person from complying with the provisions of this chapter." This section "focuses on conduct that encourages others to violate the WLAD" *Jenkins v. Palmer*, 116 Wn. App. 671, 675–76, 66 P.3d 1119 (2003).

One of Brunelle's primary "concerns was that Dr. Shoemaker regularly made inappropriate or offensive comments about race, gender, sexual orientation, religion and other immutable characteristics of people." Dkt. 70 ¶¶ 15, 47. Brunelle repeatedly reported about

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONs FOR SUMMARY JUDGMENT - 45

possible discriminatory comments that Shoemaker had made. Dkt. 70–27 at 1 ("Pt. complaints often about what he says i.e., calling patient 'flamboyant' or talking about religion when pt. doesn't want to"); *see also* Dkt. 70-4 at 1 (similar).

Axelrod makes two primary objections to Brunelle's aiding and abetting unfair practices claim. He argues, first, that no claim can be brought because Brunelle has not asserted a WLAD discrimination claim against Shoemaker. Dkt. 92 at 10. And second, he claims that Brunelle fails to provide any evidence that Axelrod aided and abetted Shoemaker's discriminatory behavior. Dkt. 92 at 9–10.

Brunelle principally relies on *Thompson v. N. Am. Terrazzo, Inc.*, No. C13-1007RAJ, 2014 WL 2048188 (W.D. Wash. May 19, 2014). In *Thompson*, the plaintiffs alleged that they had repeatedly reported discriminatory comments to defendant supervisors, but the defendants ignored the reports and failed to take any action. 2014 WL 2048188, at *3 The court held that the plaintiffs had plausibly alleged liability under the WLAD. *Id.* at *3–4. Axelrod argues that this case is different because "Plaintiffs do not assert a claim for discrimination under the WLAD against anyone[.]" Dkt. 92 at 10. The Court does not read *Thompson* to require that Plaintiffs bring a WLAD discrimination claim against Shoemaker or others to bring an aiding and abetting unfair practices claim against Axelrod.

Axelrod also argues that "Plaintiffs fail to explain how Axelrod's alleged conduct 'encouraged' Shoemaker to violate the WLAD." *Id.* at 9. Axelrod maintains that the "record evidence shows Axelrod worked with Brunelle, Rahn, and others at PeaceHealth to address patient and staff complaints against Shoemaker, including by investigating these complaints and engaging in 'a lot of conversations' with Shoemaker." *Id.* at 10. The Court agrees that this is one plausible reading of the record. Conversely, however, a reasonable jury could find that Axelrod's

support of Shoemaker—both publicly and in private conversations—shows that Axelrod was in fact aiding Shoemaker's discriminatory behavior toward patients.

Axelrod regularly brushed off Shoemaker's discriminatory comments. He referred to Shoemaker's statements as "quirks and gaffes." Dkt. 80-4 at 1. When Shoemaker was put on a PIP, Axelrod allegedly "publicly voiced his opposition" to the corrective action. *Id.* ¶ 47–48.

Brunelle has thus offered sufficient evidence that a reasonable jury could conclude Axelrod was aiding and abetting Shoemaker's discriminatory acts. Axelrod's motion for summary judgment on Brunelle's aiding and abetting claim is DENIED.

## IV.   CONCLUSION

For the reasons explained above, Defendants' motions for summary judgement are DENIED in part and GRANTED in part. Plaintiff Adelstein's claims are DISMISSED, while Plaintiff Brunelle's claims may move forward. Based on the agreement of the parties, Brunelle's claims for breach of contract and for punitive damages are also DISMISSED.

Dated this 18th day of October, 2024.

Tiffany M. Cartwright
United States District Judge